**Marshall Lee MILLER, Appellant**

v.

**William CASEY, individually and as Director, C.I.A., et al.**

No. 83–1108.

United States Court of Appeals, District of Columbia Circuit.

Argued 19 Oct. 1983.

Decided 16 March 1984.

Marshall Lee Miller, pro se.

Freddi Lipstein, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before WILKEY, BORK and SCALIA, Circuit Judges.

WILKEY, Circuit Judge:

This suit arose from two requests by appellant Marshall Lee Miller to the Central Intelligence Agency. Each request

sought access to information concerning alleged efforts by the United States and other countries to infiltrate intelligence agents and potential guerrillas into Albania during the period 1945–53. One request was made pursuant to the Freedom of Information Act (FOIA); the other pursuant to CIA regulations permitting access to classified information for historical research purposes.

The CIA denied both requests. The district court granted summary judgment for the agency. We affirm.

## I. FACTS

Miller seeks to confirm a dramatic allegation of covert warfare and high-level betrayal. He claims that the United States and the United Kingdom engaged in a "widely known but unsuccessful attempt" to overthrow the Communist government of Albania following World War II.[1] As Miller believes, the two countries cooperated to infiltrate intelligence agents and potential guerrillas into the Balkan nation; the attempt ended in failure, with the partisans meeting capture or death as soon as they reached Albania. At least one cause for the program's failure emerged several years after its termination, the plaintiff says, when program director Kim Philby defected to the Soviet Union.

### A. FOIA Request

The FOIA request submitted by Miller on 7 January 1981 asked for:

All information on attempts by the U.S., U.K., and other western countries to infiltrate intelligence agents and potential guerrillas into Albania during the period between the end of World War II and the death of Stalin in 1953, including but not

limited to those operations apparently betrayed to the Russians by Kim Philby.[2]

The CIA refused to release any documents to Miller. The CIA explained its position in a letter dated 13 February 1981:

I must advise you that the fact of the existence or nonexistence of any documents which would reveal a confidential or covert CIA connection with or interest in matters relating to those set forth in your request is classified pursuant to Executive Order 12065. Further, the fact of the existence or nonexistence of such documents would directly relate to information Central Intelligence has the responsibility to protect from unauthorized disclosure .... Accordingly, pursuant to exemptions (b)(1) and (b)(3) of the FOIA, your request is denied to the extent that it concerns any such documents. By this statement we are neither confirming nor denying that any such documents exist.[3]

Miller then met with the agency's Deputy, and amended his request on 24 April 1981 in an effort to satisfy the CIA's concerns. The amended request excluded the names of still-serving intelligence personnel, and documents prepared solely by British intelligence. Miller also offered to negotiate appropriate conditions for access to the material, so as to avoid disclosing still-sensitive information. Miller also pointed out that he had previously served as a senior government official, that he held a top secret security clearance, and that he sought the material for a book he was writing on the Balkans.[4]

On 6 May 1981, the CIA responded that its original determination remained unchanged, and treated the modified request as an appeal of the denial.[5] On 5 January 1982 the CIA denied the appeal.[6]

---

1. Brief for Appellant at 1.

2. Letter from Marshall L. Miller to John E. Bacon (7 January 1981); Joint Appendix (JA) at 10.

3. Letter from John E. Bacon to Marshall L. Miller (13 February 1981); JA at 12.

4. Letter from Marshall L. Miller to John E. Bacon (24 April 1981); JA at 13.

5. Letter from John E. Bacon to Marshall L. Miller (6 May 1981); JA at 15.

6. Letter from Harry E. Fitzwater to Marshall L. Miller (5 January 1982); JA at 22.

## B. *Historical Research Request*

On 17 June 1981, Miller sought historical research clearance to information concerning "attempts by the U.S. and other western countries to infiltrate intelligence agents and potential guerrillas into Albania during the period 1945 to 1953." Miller again recited his credentials as a scholar, his previous and then current security clearances, and factors indicating that access would be consistent with national security.[7]

The CIA denied Miller's request. The agency noted that historical research requests were to be granted only "where the researcher's needs cannot be satisfied through requests for access to reasonably described records."[8] The agency then concluded that reviewing the application for historical research clearance would be "pointless" since his appeal of the denial of his FOIA request was still pending.[9]

Miller renewed his request for historical research access on 16 February 1982.[10] The CIA denied the renewed request on 1 March 1982, explaining that Miller apparently no longer had the requisite security clearances, and that in any case access to classified information would be on a "need-to-know" basis not met by Miller's historical research needs.[11]

## II. ANALYSIS

### A. *FOIA Request*

The CIA claims that either of two FOIA exemptions—Exemptions 1, covering classified material, and Exemption 3, covering material which other statutes expressly protect from disclosure—supports its refusal to reveal whether the documents sought by Miller exist. Since each exemption requires a slightly different inquiry, we analyze each in turn.

### 1. Exemption 1

■ Exemption 1 to the FOIA protects from disclosure information which is:

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) [is] in fact properly classified pursuant to such Executive order.[12]

Executive Order 12356 controls the classification of the information sought under Miller's FOIA request. That order requires an agency to "refuse to confirm or deny the existence or non-existence of requested information whenever the fact of its existence or non-existence is itself classifiable under this Order."[13] Information may be classified when its unauthorized disclosure "either by itself or in the context of other information, reasonably could be expected to cause damage to the national security."[14] A presumption of damage to the nation's security arises from unauthorized disclosure of intelligence sources or methods.[15]

The CIA claimed that it would damage both the national security and U.S. foreign relations if it revealed whether the sought-after documents exist. An affidavit prepared by Louis J. Dube, the Information Review Officer for the Directorate of Operations of the CIA, set forth the CIA's reasons for feeling the national security would be threatened. These reasons fall into seven broad categories: 1) disclosure now might prevent foreign countries from par-

---

**7.** Letter from Marshall L. Miller to John E. Bacon (17 June 1981); JA at 18.

**8.** Letter from John E. Bacon to Marshall L. Miller (22 June 1981); JA at 20.

**9.** *Id.*

**10.** Letter from Marshall L. Miller to John E. Bacon (16 February 1982); JA at 24.

**11.** Letter from John E. Bacon to Marshall L. Miller (1 March 1982); JA at 25.

**12.** 5 U.S.C. § 552(B)(1) (1982).

**13.** Exec. Order No. 12,356, § 3.4(f)(1); 3 C.F.R. 166, 174 (1982 Comp.).

**14.** Exec. Order No. 12,356, § 1.3(b); 3 C.F.R. 166, 169 (1982 Comp.).

**15.** Exec. Order No. 12,356, § 1.3(c); 3 C.F.R. 166, 169 (1982 Comp.).

ticipating in future covert missions, 2) disclosure might hamper future relations with Albania, 3) a pattern of denials or affirmances would permit hostile nations to piece together a "catalog" of U.S. covert missions, 4) denial or affirmance would enable the Soviet Union to ascertain the reliability of its double agent, Kim Philby, 5) acknowledgement could jeopardize sources and sympathizers still within Albania, 6) acknowledgement could hamper future recruitment of sources, and 7) acknowledgement would reveal the particular intelligence method—infiltration of agents—allegedly used in the mission.[16]

■ The district court was not obliged to accept Dube's affidavit without question. The court was required to "determine the matter de novo," placing "the burden ... on the agency to sustain its action."[17] In that de novo review, however, the district court must "accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record."[18] Summary judgment is warranted on the basis of agency affidavits when the affidavits describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."[19]

Applying this standard, we affirm the District Court's finding that the CIA met its burden. The affidavit provided responds specifically and suitably to Miller's request.

■ Miller's request incorporates a basic assumption: that the covert Albanian mission actually occurred. He does not ask for information concerning rumors or published reports;[20] he seeks hard facts concerning a specific event.

Given the nature of Miller's request, responding that the agency did maintain files "on attempts by the U.S. ... *and* other western countries to infiltrate intelligence agents and potential guerrillas into Albania"[21] would show that such attempts had occurred. While, as Miller observes, the lack of such record might indicate only sloppy filekeeping by the CIA, the much stronger likelihood is that the absence of files would indicate that the U.S. participated in no such attempts. The CIA's central premise—that an answer as to whether the files existed would be tantamount to declaring whether the mission occurred—is thus sound.

Miller observes that the CIA's central premise would be less defensible if the agency had construed his request more broadly, so as to include unofficial reports of rumored activities, or CIA records of actions involving nations other than the United States.[22] The fact is, however, that

---

**16.** Affidavit of Louis J. Dube (24 September 1982); JA at 38.

**17.** 5 U.S.C. § 552(a)(4)(B) (1982). *See also Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981).

**18.** *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1982), *citing* S.Rep. No. 93–1200, 93d Cong., 2d Sess. 12 (1974), *reprinted in* 1974 U.S.Code & Cong.Admin.News 6267, 6290.

**19.** *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1982). *Accord Baez v. United States Dept. of Justice,* 647 F.2d 1328, 1335 (D.C.Cir. 1980); *Lesar v. United States Dept. of Justice,* 636 F.2d 472, 481 (D.C.Cir.1980); *Ray v. Turner,* 587 F.2d 1187, 1194–95 (D.C.Cir.1978).

**20.** Miller's request to the CIA is thus much different from his request to the State Department (not at issue here), which was phrased some-

what more broadly. In that request Miller sought:

All documents, correspondence, indices, and memoranda explaining, reporting on, providing background to, or relating to attempts by the United States, the United Kingdom, and other western countries to infiltrate intelligence agence and potential guerrillas into Albania during the period between the end of World War II and the death of Stalin in 1953, including but not limited to those operations around 1951 apparently betrayed to the Soviets by Kim Philby.

Reply Brief for Appellant at 5.

**21.** JA at 10.

**22.** Brief for Appellant at 23.

Miller's request was not broadly drawn; it made a specific inquiry about specific actions. The agency was bound to read it as drafted, not as either agency officials or Miller might wish it was drafted.

Since a response to Miller's request would have amounted to an admission or denial that the secret mission occurred, the CIA's claim of foreseeable harm to the national security is all but indisputable. The list of harms identified by Dube in his affidavit flows plausibly from an admission or denial of United States involvement.[23] As the district court found, acknowledgement that the United States took hostile action against Albania would hamper future attempts to restore diplomatic relations; confirmation that the attempts were made might provide the critical bit of information that would support retaliation against former intelligence sources; and establishment of a pattern of confirmations and denials would quite likely deter skittish potential sources from cooperating with the CIA.

Miller disputes the agency's assessment of potential harm, but fails to offer contravening evidence or evidence of agency bad faith. In effect, Miller poses his opinion that public disclosure would lead to no harm against the agency's assessment.[24]

Faced with such a clash of opinion, the courts must hew to the statutory mandate to place *"substantial weight"* on the agency's assessment of risks.[25] Since the agency assessments are both plausible and factually uncontradicted, the trial court would have been remiss in disregarding them. Judge Green acted entirely properly in

granting summary judgment under Exemption 1 based on the agency's affidavit.

### 2. Exemption 3

Exemption 3 to the FOIA protects from disclosure those matters which are "specifically exempted from disclosure by statute," provided that such statute "(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld ...."[26]

Section 403 of the National Security Act of 1947 requires the director of the CIA to "[protect] intelligence sources and methods from unauthorized disclosure."[27] Section 403 is an Exemption 3 statute.[28]

Courts are required to grant the same deference to agency determinations of whether the national security could be injured as they grant to classification decisions.[29] The thrust of the inquiry varies slightly, however, in that it depends less on the content of specific documents than the other exemptions do.[30]

The CIA argues that it would reveal "intelligence sources or methods" if it acknowledged the existence of the Albanian program.[31] The Dube affidavit indentified three possible ways that acknowledging that the document exists could jeopardize confidentiality of intelligence sources or methods: by providing the critical confirmation which would allow Albanian leaders to identify participants in the covert action; by damaging future CIA efforts to recruit sources; and by revealing how, where and when the CIA has deployed its resources.[32]

---

23. JA at 38.

24. Brief for Appellant at 24–27.

25. *Gardels v. CIA*, 689 F.2d 1100, 1106 (D.C.Cir. 1982).

26. 5 U.S.C. 552(b)(3) (1982).

27. 50 U.S.C. 403(d)(3) (Supp. V 1981).

28. *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C.Cir. 1982); *Sims v. CIA*, 642 F.2d 562, 568 (D.C.Cir.

1980); *Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

29. *Goland v. CIA*, 607 F.2d 339, 350 (D.C.Cir. 1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

30. *Id.*

31. Brief for the Defendant-Appellee at 33.

32. JA at 38.

■ Again, the courts are obliged to accord substantial weight to the agency affidavit. An official confirmation that the CIA participated in the covert action would reveal how the CIA has deployed its resources in the past, and would deter potential future sources from cooperating. Judge Green correctly found in her de novo review that the CIA had met its burden.

### B. *Historical Research Request*

Miller also argues that the CIA should have granted him "historical research access" to such files as would aid him in his research on Albania. Miller concedes that the CIA has no statutory duty to provide such access, but argues that in promulgating the regulation allowing historical research the CIA fettered its discretion.[33]

■ We hold that the CIA's decision to deny Miller research access to properly classified material cannot be reviewed by this court. The statutory mandate running to the CIA is clear: the CIA must not divulge information which would reveal intelligence sources and methods.[34] Rather than departing from the statutory mandate, the regulations promulgated by the CIA reinforce it. The regulations set minimum standards which must be met before a historical research request can be considered.[35] After the threshold standards are met, the director of the CIA can exercise his or her own discretion in deciding whether to grant access.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

---

33. Brief for Appellant at 31–33.

34. 50 U.S.C. 403(d)(3) (Supp. V 1981).

