**Todd PATTERSON, etc., Plaintiff,**

v.

**FEDERAL BUREAU OF INVESTIGATION, et al., Defendants.**

**Civ. A. No. 88–2319.**

United States District Court, D. New Jersey.

Feb. 7, 1989.

As Amended March 10, 1989.

---

Frank Askin, Constitutional Litigation Clinic, Rutgers University School of Law, Newark, N.J., for plaintiff.

Samuel A. Alito, Jr., U.S. Atty. by Susan C. Cassell, Asst. U.S. Atty., Newark, N.J., for defendants.

**1036**

## OPINION

WOLIN, District Judge.

Currently before the Court is the motion of defendant Federal Bureau of Investigation ("FBI") for summary judgment as to the first and second causes of action of plaintiff Todd Patterson's complaint and to dismiss the third cause of action. For the reasons set forth below, and after having reviewed *in camera* documents withheld by the FBI, the Court grants summary judgment in favor of the FBI dismissing the first, second and third causes of action of plaintiff's complaint. However, in consideration of the FBI's offer to expunge the name of plaintiff from any files it may possess, the Court encourages the FBI to abide by its offer and to expunge the plaintiff's name from all files, indexes or records maintained by the FBI that encompass the First Amendment activities of Todd Patterson.

## I. BACKGROUND AND PROCEDURAL HISTORY

The facts of this case vividly illustrate the parental concern and public consternation which can be produced when the apparently remote world of high-tech intelligence and counter-intelligence is applied to the everyday world of grade school and school projects in the name of national security.

In 1983, plaintiff Todd Patterson, then a sixth grade elementary school student, decided to write an encyclopedia of the world. Not being content with the local library's resources, Todd undertook to write to all the countries of the world, 169 in all, to obtain information. Significantly, plaintiff enclosed much of his correspondence in envelopes bearing the return address of Laboratory Disposable Products, a business Todd's parents operate from their home.

The flood of international correspondence which Todd's project engendered apparently caught the eye of the FBI, through means and methods which the FBI does not wish revealed on account of national security concerns. Todd and his par-

ents contend that many pieces of mail from foreign countries were received in damaged condition, particularly mail from the Soviet Union. The FBI, through affidavits and other supporting papers, denies any responsibility for opening or damaging Todd's mail.

What is undisputed is that, besides mail, Todd's project also caused Todd to receive a visit from the FBI. In late 1983, Agent John E. Butenschoen, from the FBI's Parsippany, New Jersey branch, appeared unannounced at the plaintiff's home in North Haledon, New Jersey. Agent Butenschoen spoke to Todd's mother and father, the latter by telephone, concerning Todd's project. Agent Butenschoen was shown Todd's room, the correspondence received by plaintiff, and the purpose Todd was using the correspondence for.

Agent Butenschoen requested that plaintiff, who was at elementary school at the time of the visit, call the agent. Soon after the visit, Todd did call Agent Butenschoen and spoke with him regarding plaintiff's project and his information requests to other countries.

As a result of Todd's project and the visit by Agent Butenschoen, it is clear that the FBI came to maintain at least one file on the plaintiff. Lieberman Affidavit, p. 7. On or about July 13, 1983, an FBI airtel was written relating to Laboratory Disposable Products. The document requested that the Newark Division "conduct appropriate investigation regarding the captioned company in accordance with Attorney General Guidelines." Defendant's Notice of Motion for Summary Judgment, Exhibit B, Document No. 1.

After Agent Butenschoen's visit to Todd's home, and apparently as a result of his investigation of the matter, an FBI memorandum was written on or about February 23, 1984. Defendants' Notice of Motion for Summary Judgment, Exhibit B, Document No. 2. This document changed the subject heading from "Laboratory Disposable Products" to "Todd Patterson." The memorandum contains a description of Todd's project and further states "Newark indices as well as local criminal checks neg-

ative on subject" and "[i]n view of the above, Newark contemplates no further investigation in this matter." The memorandum demonstrates that once the FBI learned the source of the international correspondence was not an entity called "Laboratory Disposable Products" but was in reality a seventh grader involved in a school project, the FBI wisely concluded that no espionage was being committed.

While Agent Butenschoen's visit to the Pattersons and the February 23, 1984 memorandum should have been the end of the matter, the Patterson's involuntary foray, whether real or imagined, into the world of counter-intelligence and national security, was not yet complete. During the summer of 1984, Todd Patterson received an invitation for a visit from the Soviet Mission in New York City. Concerned that the FBI was somehow monitoring plaintiff's activities, plaintiff's father requested that Todd contact Agent Butenschoen. Todd did so and informed the agent of the invitation. The agent requested that Todd report back to him after the visit. Affidavit of Todd Patterson, p. 3. Todd's visit to the Soviet Mission and his subsequent "debriefing" apparently went off without incident.

The FBI continues to maintain that it conducted no further investigation of plaintiff after 1983. Defendant's Reply Memorandum, p. 3. However, an airtel dated December 5, 1985, released by the FBI, along with five attachments that were not released, demonstrates that as of that date some entity of the United States Government continued to conduct activities that involved the plaintiff. Defendant's Notice of Motion, Exhibit B, Document No. 5. The FBI responds, somewhat cryptically, that "[t]he specifics of how that 1985 airtel information came to the FBI is, of course, covered by the military and state secrets privilege, but it was not through any further investigation by the FBI." Defendant's Reply Memorandum, p. 3.

Finally, throughout the entire period of plaintiff's contact with the FBI and other unknown forces of counter-intelligence, up to the present, plaintiff maintains that at least 50 pieces of mail have been received in damaged condition, most of which originated in the Soviet Union. Plaintiff's Statement of Material Facts, ¶ 9. Plaintiff and his parents also report of hearing strange background noises on their telephones since 1983. Indeed, a now deceased employee of the Pattersons is said to have heard a voice say "Operator, this is not the phone I want tapped." *Id.* at ¶ 16.[1] The FBI strenuously refutes the Patterson's allegations of mail tampering and wiretapping, and the FBI characterizes the employee's story as an attempt to feed "Mr. Patterson's paranoid fantasy of governmental wiretapping." Defendant's Reply Memorandum, p. 2.

In early 1987, plaintiff learned that he could request access to records the FBI might be maintaining on him through use of the Freedom of Information Act ("FOIA").[2] Pursuant to FOIA, plaintiff made a request to the FBI in Washington, D.C. for "copies of my personal file in your records." Exhibit A–7 to defendant's notice of motion for summary judgment. By letter dated August 12, 1987, plaintiff was informed that "[t]he information pertaining to you in FBIHQ records is exempt from disclosure pursuant to Title 5, United States Code, Section 552(b)(1) and Title 5, United States Code, Section 552a(j)(2)."

Plaintiff appealed the denial of his FOIA request by letter from his father to the Department of Justice's Office of Information and Privacy. On October 20, 1987, Richard L. Huff, co-director of the Office of Information and Privacy, notified plaintiff that his FOIA appeal had been denied. Plaintiff was also notified of his right to seek judicial review of the agency's determination in the United States District Court. One month later, Huff wrote to

---

1. The Court notes that the employee's story, while ominous sounding, is inherently unreliable and, because of the employee's death, inadmissible hearsay.

2. 5 U.S.C. § 552 (1982 & Supp. II (1985) (as amended by Freedom of Information Reform Act of 1986, Pub.L. No. 99–570, Subtit. N, §§ 1801–1804, 100 Stat. 3207–6, 3207–48 to 3207–50 (1986)).

inform the Pattersons that, after a further review of Todd's request, six pages of the plaintiff's file were being declassified. Exhibit A–11. In March, 1988, plaintiff initiated a second FOIA request, this time directed at the FBI's Newark Field Office. In May of 1988, Todd initiated a civil suit through his father, Edgar Patterson, against defendants FBI, John Doe, an unknown employee of the United States Government, and John Doe Agency, an unknown agency of the United States Government.[3] Plaintiff's suit seeks injunctive relief and/or damages under three distinct causes of action: failure to comply with FOIA; violations of the Privacy Act, 5 U.S. C. § 552a *et seq.*, as a result of the FBI's maintenance of files describing plaintiff's exercise of rights guaranteed by the First Amendment; and violations of plaintiff's First and Fourth Amendment rights and of 18 U.S.C. § 1702 and 19 U.S.C. § 482, statutes relating to the U.S. mail.

On September 26, 1988, the FBI filed the summary judgment motion now before the Court. At the close of oral argument on defendant's motion, the Court reserved decision and ordered the defendant to submit an *in camera* affidavit establishing a rational link between specific law enforcement objectives and statutes and the files which the FBI maintained on the First Amendment activities of the plaintiff. Subsequent to oral argument, the Court further ordered that the FBI submit to the Court for *in camera* inspection certain specified documents which the FBI is seeking to withhold from the plaintiff. Letter and Order, December 30, 1988 (attached as Appendix A to this Opinion). The FBI responded to the Court's order by submitting for *in camera* inspection by the Court the entire content of records maintained by the FBI concerning plaintiff's FOIA request. The defendant also formerly invoked the military and state secrets privilege in response to discovery sought by the plaintiff by means of an affidavit of Attorney General Dick Thornburgh dated January 13, 1989.

## II. DISCUSSION

### A. *Plaintiff's FOIA Claim*

█ In all FOIA cases, the role of the District Court is to review de novo all agency claims that material requested pursuant to FOIA is subject to an exemption contained in the statute.[4] In such a case, the agency bears the burden of justifying its decision to withhold requested information.[5] *King v. U.S. Dept. of Justice*, 830 F.2d 210, 217 (D.C.Cir.1987); *Miller v. Casey*, 730 F.2d 773, 776 (D.C.Cir.1984). The agency may meet this burden through the filing of affidavits that describe the material withheld and articulate why the material falls within the claimed exemption. *King*, 830 F.2d at 217; *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981). In the present case, the FBI claims that the withheld material falls under Exemption 1 of FOIA, relating to National Security, and Exemption 7, concerning protection of privacy.

### 1. Exemption 1—National Security

Exemption 1 of FOIA enables an agency to refrain from disclosing information that is "specifically authorized under criteria established by an Executive Order to be kept secret in the interest of the national defense or foreign policy and ... [is] in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1). The relevant Executive Order in this case is Executive Order on National Security Information, No. 12356, 47 Fed.Reg. 14874, issued by President Reagan on April 2, 1982, becoming effective on August 1, 1982.

**3.** Plaintiff's suit originally concerned only plaintiff's FOIA request to the FBI's Washington office. However, in the interests of judicial economy, this Court and defendant are treating plaintiff's second FOIA request as part of this action, and the FBI has released the pertinent de-classified documents, in redacted form, complying with plaintiff's second request, and has included the justification for the redactions in the declarations and motions filed in this action. Defendant's Supporting Memorandum, p. 2, n. 1.

**4.** 5 U.S.C. § 552(a)(4)(B) (1982).

**5.** *Id.*

When determining if an agency has properly withheld information pursuant to Exemption 1, a district court, as in all FOIA cases, must conduct a de novo review. However, both the legislative history of FOIA and the subsequent caselaw suggest that courts must "accord substantial weight to an agency's affidavit concerning the details of the classified status of a disputed record" given that "executive departments responsible for national defense and foreign policy matters have unique insights into what adverse effects might occur as a result of public disclosure." *Salisbury v. United States*, 690 F.2d 966, 970 (D.C.Cir.1982) (quoting S.Rep. No. 1200, 93 Cong.2d Sess. 12 (1974) (conference report) *reprinted in* 1974 U.S.Code & Admin. News, pp. 6267, 6290); accord *King v. U.S. Department of Justice*, 830 F.2d at 217 ("The court owes substantial weight to detailed agency explanations in the national security context.").

Even with the substantial weight standard, a court should grant summary judgment to an agency invoking Exemption 1 only if the agency supplies affidavits[6] that describe the withheld documents and the justifications for non-disclosure in sufficient detail and particularity so as to demonstrate that "material withheld is logically within the domain of the exemption claimed." *King v. U.S. Department of Justice*, 830 F.2d at 217. Moreover, a court should refrain from considering the agency affidavits dispositive if there is contradictory evidence in the record or if the specter of agency bad faith is demonstrated to the court. *Id.; Miller v. Casey*, 730 F.2d at 776; *Military Audit Project v. Casey*, 656 F.2d at 738.

In the case at hand, the FBI has produced the affidavit of Special Agent Philip W. Thomas to serve as a *Vaughn* index with regard to the application of Exemption One to plaintiff's FOIA requests. As the relevant section of FOIA, 5 U.S.C. § 552(b)(1), requires, the Thomas affidavit seeks to demonstrate that the withheld material is under the purview of an Executive Order and has been properly classified pursuant to such order.

Taking the procedural requirement first, the Court is satisfied that the Thomas affidavit sufficiently establishes that the FBI adhered to the procedural requirements of Executive Order 12356 when the withheld FOIA material was classified. EO 12356, §§ 1.5(a)(1)–(4), 1.6.

Turning to the substantive requirement of EO 12356, the Court must evaluate the merits of the Thomas affidavit's assertion that the withheld material fits under the classification criteria of EO 12356. The Thomas affidavit places its reliance on EO 12356, § 1.3(a)(4), which provides:

Sec. 1.3 Classification Categories.

(a) Information shall be considered for classification if it concerns:

 * * * * * *

(4) intelligence activities (including special activities), or intelligence sources or methods.

The above provision must be read in conjunction with EO 12356, § 1.3(b):

Information that is determined to concern one or more of the categories in Section 1.3(a) shall be classified when an original classification authority also determines that its unauthorized disclosure, either by itself or in the context of other information, reasonably could be expected to cause damage to the national security.

The FBI's choice to rely on the sources and methods classification category of the Executive Order struck the Court as eminently sensible considering the unlikelihood that any intelligence collected on a grade school student such as Todd would directly implicate the security of the Republic. However, upon initial review, the Court was unconvinced that the Thomas affidavit sufficiently demonstrated that the material withheld by the FBI in response to plaintiff's FOIA request belonged under the purview of EO 12356 § 1.3(a)(4), and that

---

**6.** An affidavit which supplies an index of withheld documents detailing the justification for exemption claims has come to be known as a *Vaughn* index. *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

release of the withheld material reasonably could be expected to cause damage to the national security. In particular, the Court found that the Thomas Affidavit was unduly vague and repetitive in referring to the withholding of Document No. 4 in Exhibit B of the FBI's notice of motion, a one-page FBI airtel dated January 6, 1984, along with 17 attached pages, and Document No. 5, a one-page FBI airtel dated December 5, 1985, along with five attached pages.[7]

■ While mindful of the limitations faced by the FBI in its attempt to describe why classified material is exempt from FOIA, the Court was concerned that allowing the FBI's cursory description of 24 pages of withheld material to suffice would not comport with this Court's task of conducting a meaningful de novo review of defendant's decision to withhold material under FOIA. Therefore, the Court ordered the FBI to submit the relevant withheld material for *in camera* inspection, although cognizant of the presumption that recourse to *in camera* inspection of classified documents should not be resorted to lightly. See *Church of Scientology v. U.S. Department of the Army*, 611 F.2d 738, 743 (9th Cir.1979) (citations omitted).

In this case, the Court found *in camera* inspection of the relevant documents to be the best means available to render substantial justice to plaintiff's claims, yet also insure that any legitimate intelligence activities, sources or methods of the government remain protected against public disclosure. Having now conducted such an *in camera* inspection of the original, withheld material and the additional affidavit of Assistant Director of the FBI James H. Greer ("Greer Affidavit"), the Court finds that the material withheld by the FBI falls under the purview of EO 12356 § 1.3(a)(4), and that release of the withheld material reasonably could be expected to cause damage to the national security.

■ An agency asserting the national security exemption to FOIA need not demonstrate that an actual or substantial risk to the national security would result if the requested material were to be released. All that is required is for the agency to make a plausible showing that release of withheld documents would create a reasonable expectation of damage to the national security. *Halperin v. C.I.A.*, 629 F.2d 144, 149 (D.C.Cir.1980). The withheld material, read in conjunction with the Greer Affidavit, does establish a logical connection between each withheld or redacted document and the risk that certain intelligence methods or sources would be compromised if the withheld material was released.

Furthermore, the Court is convinced that the representations of the FBI, as expressed in the Thomas and Greer Affidavits, are not controverted either by contrary evidence in the record or substantive evidence of agency bad faith, and that the FBI did not run afoul of EO 12356's warning that:

> In no case shall information be classified in order to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require pro-

---

7. The relevant portion of the Thomas affidavit states:

> (35) Document 4 has 17 separate attachments which are classified 'Secret' in their entirety. These attachments contain specific, detailed information provided by an intelligence source, method, or activity. The information is of such detail that it may pinpoint a critical time frame, reflect a special vantage point, or reveal a style of reporting peculiar to that source, method, or activity, any of which, if disclosed, would reveal the source of the information. Thus exposed, the source's methods, or activity's effectiveness would be termi-

nated and could reasonably be expected to result in identifiable damage to the national security. A further discussion of the types of damage to the national security has been previously set forth at Paragraphs 12–14, *supra.*

> \* \* \* \* \* \*

> (41) Document # 5 has 5 separate attachments which are classified 'Secret' in their entirety. These attachments contain specific, detailed information provided by an intelligence source, method, or activity. The reasons for classifying this type of detailed information have been previously set forth at Paragraph 35, *supra.*

tection in the interest of national security.

EO 12356, § 1.6(a).

The plaintiff's allegation that much of his international correspondence arrived in damaged condition, when evaluated in conjunction with the documents inspected by this Court *in camera*, does not support a finding that the FBI illegally opened plaintiff's mail or create a genuine factual issue of whether any instrumentality of the United States Government illegally interfered with plaintiff's mail. The distance the mail traveled, the size and content of the envelopes, and the national origin of the mail are the far more likely culprits in assessing why plaintiff's mail may have arrived in damaged condition. Also, plaintiff's allegation of electronic eavesdropping is not substantiated by any substantive, credible or admissible evidence, and, as such, cannot support any finding of bad faith on the part of the FBI.

It is unfortunate that plaintiff's ambitious project has caused classified documents to be prepared about him. At first blush, the investigation appears ludicrous. However, a review of the facts suggests that the rate of plaintiff's correspondence and plaintiff's use of return envelopes marked "Laboratory Disposable Products" could be expected to prompt the FBI to collect information about the correspondence using properly classified intelligence sources and methods. This fact, taken in conjunction with the Court's *in camera* inspection of the withheld documents, necessitates a finding, upon de novo review, that the FBI properly withheld material pursuant to Exemption One of FOIA. Therefore, the Court will grant summary judgment dismissing plaintiff's FOIA claim.

2. Exemption 7—Investigatory Records and Invasion of Privacy

■ Because the Court finds that the FBI has properly withheld requested documents under Exemption One to FOIA, the Court need not consider at length the FBI's attempt to withhold names of FBI agents and employees who worked on the Patter-

son case through invocation of § 552(b)(7)(C), which exempts from disclosure:

(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ...

(C) constitute an unwarranted invasion of personal privacy....

The Court finds that the relevant case-law supports the view that Exemption 7(C) of FOIA can apply to the invasion of privacy of law enforcement personnel, identification of whom "could conceivably subject them to harassment and annoyance in the conduct of their official duties and in their private lives." *Nix v. United States*, 572 F.2d 998 (4th Cir.1978). The possibility of invasion of the privacy of law enforcement personnel must be balanced "against the public benefit that would result from disclosure." *Lame v. U.S. Dept. of Justice*, 654 F.2d 917, 923 (3d Cir.1981).

In the case at hand, the public benefit that would result from releasing the names of FBI personnel involved in the investigation of Todd Patterson is negligible, particularly in view of the Court's finding that the FBI engaged in no illegal conduct in regard to its investigation of plaintiff. Therefore, the FBI properly invoked Exemption Seven to justify the withholding of the names of FBI personnel in response to plaintiff's FOIA request.

B. *Plaintiff's Privacy Act Claim*

The Privacy Act, 5 U.S.C. § 552a (1982), like the Freedom of Information Act, "demonstrates a congressional desire to foster open government and accessibility to government records." *Vymetalik v. F.B.I.*, 785 F.2d 1090, 1092 (D.C.Cir.1986). The Privacy Act is primarily designed to make government agencies more accountable regarding the gathering, disseminating and accuracy of records maintained in government files about individuals. The Act limits the discretion of agencies to collect and maintain information about individuals and requires that government records be maintained "with such accuracy, relevance, timeliness, and completeness as is

reasonably necessary to assure fairness to the individual[.]" *Greentree v. U.S. Customs Service,* 674 F.2d 74, 76 (D.C.Cir. 1982) (discussing the purposes and history of the Privacy Act).

In his second cause of action, plaintiff relies on § 552a(e)(7), which provides:

> (e) Agency requirements.—Each agency that maintains a system of records shall—

> (7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

An individual can enforce a violation of § 552a(e)(7) by bringing a civil suit pursuant to § 552a(g)(1).[8]

**8.** (g)(1) Civil Remedies.—Whenever any agency

(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

(B) refuses to comply with an individual request under subsection (d)(1) of this section;

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

(2)(A) In any suit brought under the provisions of subsection (g)(1)(A) of this section, the court may order the agency to amend the individual's record in accordance with his request or in such other ways as the court may direct. In such a case the court shall determine the matter de novo.

**9.** Section 552a(j) provides:

(j) General exemptions.—The head of any agency may promulgate rules, in accordance with the requirements (including general no-

As a preliminary matter, the FBI claims to have exempted its central records system from the civil remedy provision of the Privacy Act through promulgation of 28 C.F.R. § 16.96. However, that rule exempts the central records system "only to the extent that information in this system is subject to exemption pursuant to 5 U.S.C. [§] 552[a](j) and (k)." Section 552a(j)(2), in turn, allows an agency to exempt records only to the extent they were compiled for purposes of a criminal investigation.[9]

█ The FBI cannot claim that all of its records must necessarily be considered as compiled for purposes of criminal investigation merely by virtue of the function that the FBI serves. *Vymetalik,* 785 F.2d 1090, 1095; *Pratt v. Webster,* 673 F.2d 408, 415 n. 14 (D.C.Cir.1982). Instead, the FBI must adequately demonstrate that its records on plaintiff were compiled specifi-

tice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from any part of this section except subsections (b), (c)(1) and (2), (e)(4)(A) through (F), (e)(6), (7), (9), (10), and (11), and (i) if the system of records is—

(1) maintained by the Central Intelligence Agency; or

(2) maintained by an agency or component thereof which *performs as its principal function* any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals, and the activities of prosecutors, courts, correctional, probation, pardon, or parole authorities, and which consists of (A) information compiled for the purpose of identifying individual criminal offenders and alleged offenders and consisting only of identifying data and notations of arrests, the nature and disposition of criminal charges, sentencing, confinement, release, and parole and probation status; (B) *information compiled for the purpose of a criminal investigation,* including reports of informants and investigators, and associated with an identifiable individual; or (C) reports identifiable to an individual compiled at any stage of the process of enforcement of the criminal laws from arrest or indictment through release from supervision.

As shown by the above language, § 552a(j)(2) also allows an agency to exempt records related to identifying criminal offenders or compiling reports about individuals after indictment or arrest. However, only category (B) information related to a criminal investigation is pertinent here.

cally for purposes of a criminal investigation. In the case at bar, the FBI has not made such a showing. Because of this, the FBI cannot properly contend that the plaintiff's Privacy Act claim is barred by the FBI's regulation exempting the FBI's central records system from the civil remedy provision of the Privacy Act.

However, even if the FBI has not satisfied the § 552a(j)(2) standard of a "criminal investigation", the FBI would still be entitled to summary judgment on plaintiff's Privacy Act claim if it could show that records the FBI maintained on plaintiff's exercise of First Amendment rights were "pertinent to and within the scope of an authorized law enforcement activity," under the dictates of § 552a(e)(7). Indeed, interpretation of the Privacy Act suggests that it would be easier for the FBI to satisfy the "law enforcement activity" standard of § 552a(e)(7) rather than the "criminal investigation" standard of § 552a(j)(2). Thus, the Court will focus on whether the FBI has demonstrated that the records maintained on plaintiff were pertinent to an authorized law enforcement activity of the FBI.

The precise meaning of "pertinent to and within the scope of an authorized law enforcement activity" is not provided by the statute itself. The statute's definitions do not include the term "law enforcement activities," and the phrase does not appear anywhere else in the statute. However, interpretation of the phrase must be viewed in light of Congress's intention for Section (e)(7) of the Privacy Act to restrict the information about individuals' First Amendment activities that the government may collect and maintain and to prevent "collection of protected information not immediately needed, about law-abiding Americans, on the off-chance that government or the particular agency might possibly have to deal with them in the future." S.Rep. 1183, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 6916, 6971.

Thus, the relatively few circuit courts which have interpreted Section (e)(7) have all found that the law enforcement activity exception must be read narrowly and that the agency involved must make an affirmative showing that the records maintained on First Amendment activities were in some way related to law enforcement objectives, although the courts have differed somewhat on the exact standard warranted. See *MacPherson v. I.R.S.*, 803 F.2d 479 (9th Cir.1986) (individual, case-by-case analysis of whether agency's actions were pertinent to authorized law enforcement activity); *Jabara v. Webster*, 691 F.2d 272, 279 (6th Cir.1982) (Section (e)(7) "allows investigation with respect to the exercise of First Amendment rights if such investigation is relevant to an authorized criminal investigation or to an authorized intelligence or administrative one."), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed. 2d 170 (1983); *Clarkson v. I.R.S.*, 678 F.2d 1368, 1375 (11th Cir.1982) (Section (e)(7) is violated "to the extent that the [agency] has engaged in the practice of collecting protected information, unconnected to any investigation of past, present or anticipated violations of the statutes which it is authorized to enforce ..."), *cert. denied*, 481 U.S. 1031, 107 S.Ct. 1961, 95 L.Ed.2d 533 (1987). See also *Nagel v. U.S. Dept. of Health, Education and Welfare*, 725 F.2d 1438, 1441 n. 3 (D.C.Cir.1984) (adopting *Jabara* standard).[10]

■ This Court finds that the legislative purpose of § 552(e)(7) is best effectuated by requiring agencies to demonstrate that any and all records maintained on an individual's exercise of First Amendment rights are *relevant* to an authorized law enforcement activity of the agency, and that there exists a sufficient basis for the maintenance of such records.[11] Moreover, the Court recognizes that any question of relevance must be linked with consideration of the facts of a particular case. See *MacPherson v. I.R.S.*, 803 F.2d at 484.

---

**10.** The Third Circuit has not yet considered the question faced here.

**11.** All cases considering Section (e)(7) have concluded that even after the pertinent law enforcement activity has been completed, the agency can continue to maintain the related records.

Turning to the facts of the case at hand, the Court found on its initial review that the FBI had not adequately demonstrated that its activities directed at plaintiff's exercise of First Amendment rights were relevant to an authorized law enforcement activity. All defendant submitted in this regard was a five line paragraph citing to the Espionage Statute and the Foreign Agents Registration Act, without any reference to facts in some way linking the plaintiff's First Amendment activities with enforcement of those statutes.[12]

 While the FBI need not make a showing that probable cause or reasonable suspicion may have existed about plaintiff, the agency must furnish facts which at least demonstrate that the records maintained on plaintiff's exercise of First Amendment rights, such as letterwriting, were relevant to a legitimate, authorized law enforcement objective. Reference to statutes, without any underlying factual basis, cannot suffice given the intent of Congress to curtail the extent of records government agencies may maintain on individuals' exercise of First Amendment rights. As one court has stated:

The mere compilation by the government of records describing the exercise of First Amendment freedoms creates the possibility that those records will be used to the speaker's detriment, and hence has a chilling effect on such exercise.

*Nagel*, 725 F.2d at 1441.

 Because the FBI had not made an adequate showing of the relevance of records maintained on plaintiff's exercise of First Amendment rights to an authorized law enforcement activity, the Court ordered the FBI to submit an *in camera* affidavit which would further attempt to demonstrate the required relevance. The FBI subsequently submitted the Greer Affidavit to serve this purpose. Upon review of the Greer Affidavit, the Court now finds that records maintained by the FBI on

plaintiff's exercise of First Amendment Rights are relevant to an authorized law enforcement activity of the FBI and that the continued maintenance of such records does not violate any provision of the Privacy Act.

In retrospect, it is clear that plaintiff violated no laws in the course of his correspondence project nor was involved in any clandestine activity, yet the FBI could not have known this prior to undertaking some type of investigation. Such an investigation, and any related records kept, would be justified as long as the FBI complied with the relevant statutes and undertook the investigation in the least intrusive means possible given the circumstances. The Court finds the FBI's investigation and maintenance of records on plaintiff does fit within statutory and regulatory limits. This finding may be of only limited consolation to plaintiff, whose legitimate exercise of First Amendment rights resulted in an FBI file. However, plaintiff can take satisfaction in the fact that his resort to the judicial process has resulted in this Court conducting an independent examination of the FBI's conduct in accordance with the statutory standard as set out by Congress in the Privacy Act. In the Privacy Act, Congress implicitly accepted that the slight chill on free speech created by agency maintenance of records on First Amendment activity is necessary in light of the need for agencies to maintain adequate records relevant to legitimate law enforcement activities. After reviewing the Greer Affidavit, the Court finds that the FBI has acted properly in regard to records maintained about plaintiff. However, the *in camera* inspection also allows this Court to assure plaintiff that any records maintained by the FBI on him do not reflect negatively on his character or conduct. Accordingly, the Court can assure plaintiff that the law enforcement activity conducted by the FBI in this case should not in any way inhibit him from pursuing any legit-

---

12. The FBI's paragraph on authorization states: IV. JUSTIFICATION FOR FBI'S INVESTIGATION (L) A foreign counterintelligence investigation was conducted by the FBI. The authority for this type of investigation includes such statutes as Title 18, U.S.C., Sections 792–798 (Espionage) and Title 22, U.S.C., Section 611–621 (Foreign Agents Registration Act). Lieberman Affidavit, ¶ 10.

imate exercise of his First Amendment rights, including writing letters to countries throughout the world. Furthermore, plaintiff's fear of an aborted or limited public service career arising out of these events is misplaced.

Therefore, the Court will grant the FBI's motion for summary judgment, dismissing the Privacy Act claim of plaintiff's complaint.

C. *Plaintiff's Cause of Action Based on Violations of the First and Fourth Amendments and 18 U.S.C. § 1702 and 19 U.S.C. § 482*

Apart from his FOIA and Privacy Act causes of action, plaintiff alleges that defendant violated his First and Fourth Amendment rights, as well as the provisions of 18 U.S.C. § 1702,[13] and 19 U.S.C. § 482.[14]

**1. First Amendment Claim**

██ An individual alleging direct violation of the Constitution may bring suit against federal officials for damages and equitable relief. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29

L.Ed.2d 619 (1971). Plaintiff in this case has named John Doe, an unknown employee of the United States government, as a defendant. A *Bivens* suit [15] is available to remedy violation of a number of constitutional provisions, including the First Amendment.[16] See *e.g. Ogden v. United States*, 758 F.2d 1168 (7th Cir.1985); *Angola v. Civiletti*, 666 F.2d 1 (2d Cir.1981); *Paton v. LaPrade*, 524 F.2d 862 (3d Cir. 1975).

██ The touchstone of a *Bivens* suit must be some illegal or inappropriate conduct on the part of a federal official which results in a Constitutional violation. *Paton*, 524 F.2d at 869. After reviewing the record as a whole, including *in camera* inspection of the withheld documents and the Greer Affidavit, the Court finds, as a matter of fact, that the FBI and any FBI or other government employees involved in activities concerning plaintiff acted in accord with all applicable statutory and regulatory guidelines. Beyond finding compliance with the relevant statutes and regulatory guidelines, the Court finds that regulations which authorized the activities undertaken by defendant in this case did not

**13.** 18 U.S.C. § 1702 provides:

Obstruction of correspondence
Whoever takes any letter, postal car, or package out of any post office or any authorized depository for mail matter, or from any letter or mail carrier, or which has been in any post office or authorized depository, or in the custody of any letter or mail carrier, before it has been delivered to the person to whom it was directed, with design to obstruct the correspondence, or to pry into the business or secrets of another, or opens, secretes, embezzles, or destroys the same, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

**14.** 19 U.S.C. § 482 provides:

Search of vehicles and persons
Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which he or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk

or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial.

**15.** Plaintiff's claim is not technically a *Bivens* action, since plaintiff seeks no monetary damages. See *Paton v. LaPrade*, 524 F.2d 862, 869 (3d Cir.1975). However, legal analysis is essentially the same as for a standard *Bivens* action.

**16.** The Court notes that to the extent plaintiff's First Amendment claim involves damages as a result of the FBI's maintenance of records on plaintiff, such an action is apt to be foreclosed by the existence of the Privacy Act. This is in keeping with the principle that a *Bivens* action is foreclosed if Congress provides an alternative, adequate remedy. *Bush v. Lucas*, 462 U.S. 367, 378, 103 S.Ct. 2404, 2411, 76 L.Ed.2d 648 (1983).

impermissibly chill plaintiff's First Amendment right of free speech, and represent a lawful exercise of the federal government's responsibility for conduct of foreign policy and national security affairs with negligible First Amendment implications. See *United States v. Robel,* 389 U.S. 258, 267–68, 88 S.Ct. 419, 425, 19 L.Ed.2d 508 (1967) ("We have recognized that, while the Constitution protects against invasions of individual rights, it does not withdraw from the government the power to safeguard its vital interests.... Faced with a clear conflict between a federal statute enacted in the interests of national security and an individual's exercise of his First Amendment rights, we have confined our analysis to whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal."). In the current case, there is in fact no direct conflict between plaintiff's First Amendment rights and the relevant statutory provisions and administrative regulations as applied. Moreover, any limitations on plaintiff's First Amendment freedoms are minimal and appropriate considering the important foreign policy and national security objectives involved.

Therefore, plaintiff's claim for injunctive relief based on the government's violation of his First Amendment rights must be denied and summary judgment entered in favor of defendants.

### 2. Fourth Amendment Claim

■ Plaintiff asserts that defendants violated his Fourth Amendment rights through the unlawful opening of his mail. However, as with plaintiff's First Amendment claim, the Court finds after reviewing the record and the *in camera* submissions of defendant, that the FBI conducted no illegal searches involving plaintiff and acted in accordance with all relevant statutory and administrative guidelines.

Plaintiff argues that even if the present record does not support a claim of Fourth Amendment violation, summary judgment is foreclosed because of the failure of the FBI to respond adequately to plaintiff's discovery requests. However, this argu-

ment must fail in light of the Court's finding that the FBI has properly invoked the military and state secrets privilege. The standard for evaluating a claim of the state secrets privilege was set forth at length by the District of Columbia Circuit in *Ellsberg v. Mitchell,* 709 F.2d 51 (D.C.Cir.1983), *cert. denied sub nom., Russo v. Mitchell,* 465 U.S. 1038, 104 S.Ct. 1316, 79 L.Ed.2d 712 (1984); *cert. denied sub nom., Russo v. Mitchell,* —— U.S. ——, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987). The D.C. Circuit stated:

> Although there can be no abdication of a judicial role in connection with proposed applications of the state secrets doctrine, it is nevertheless frequently noted that the trial judge should accord considerable deference to recommendations from the executive department. Moreover, it is recognized that the government need not demonstrate that injury to the national interest will inevitably result from disclosure; a showing of 'reasonable danger' that harm will ensue is sufficient. Finally, when assessing claims of a state secrets privilege, a trial judge properly may rely on affidavits and other secondary sources more often than he might when evaluating assertions of other evidentiary privileges.

*Id.* at 59 (citations omitted).

In the case at bar, the Court finds a "reasonable danger" that harm to the national interest will ensue if defendants are forced to comply with plaintiff's discovery requests. Therefore, the FBI's proper assertion of the state secrets privilege taken in conjunction with the Court's determination that the present record contains no evidence supporting a finding of illegal conduct on the part of the FBI, warrants the Court granting defendant's summary judgment dismissing plaintiff's Fourth Amendment claim.

### 3. Plaintiff's Statutory Claims

■ The plaintiff's claims based on alleged violations of 18 U.S.C. § 1702 and 19 U.S.C. § 482 are in large part identical to the plaintiff's First and Fourth Amendment claims considered above. To succeed on a

claim based on either statute, plaintiff would need to present evidence of an illegal interference with his mail. However, the Court finds, after considering the *in camera* submissions of defendant, that there is no evidence which would support a finding of illegal tampering or interference with plaintiff's mail. Furthermore, the FBI's proper invocation of the state secrets privilege forecloses plaintiff from claiming inadequate response to his discovery requests.

Therefore, the Court must grant summary judgment dismissing plaintiff's claims brought under 18 U.S.C. § 1702 and 19 U.S.C. § 482.

D. *The FBI's Offer to Expunge Plaintiff's Name From Its Files*

In its supporting papers and again at oral argument, the FBI offered to expunge the name of Todd Patterson from its records. This offer strikes the Court as a fair and practical resolution of this litigation. It enables the FBI to safeguard information concerned with sources and methods of counter-intelligence while at the same time it eliminates any potential damage to plaintiff which he envisions the FBI's past activities may cause him in the future. However, because the Court has found that the FBI engaged in no illegal or overly intrusive conduct, it would be inappropriate for this Court to now order the FBI to expunge plaintiff's name from its files. See *Paton v. LaPrade*, 524 F.2d at 868–69. Nonetheless, the Court invites the FBI to abide by its offer to expunge plaintiff's name, as the Court believes it to be the type of good faith gesture that will help defuse the sense of outrage that precipitated this proceeding.

### III. CONCLUSION

For the reasons set forth above, the Court grants defendant FBI's motion for summary judgment dismissing the first, second and third causes of action of plaintiff's complaint, and the Court will order that judgment be entered in favor of all defendants, real and fictitious, named in plaintiff's action.

An appropriate order shall be submitted by counsel for defendant.

### APPENDIX A

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

December 30, 1988

Susan C. Cassell, Esq.
Assistant U.S. Attorney
970 Broad Street
Newark, NJ 07102
Frank Askin, Esq.
Constitutional Litigation Clinic
Rutgers University School of Law
15 Washington Street
Newark, NJ 07102

Re: Todd Patterson v. Federal Bureau of Investigation, et al. Civil Action No. 88–2319

Dear Counsel:

Currently before the Court is the FBI's motion for summary judgment directed against the claims of plaintiff Todd Patterson. At the close of oral argument, I indicated that an opinion on the motion would be issued within a week. However, because certain issues were raised in oral argument that were not adequately addressed in the supporting papers, I have concluded that *in camera* inspection of certain withheld documents is required in order for this Court to assure itself that the FBI has acted in good faith with regard to its investigation of Todd Patterson, that the FBI complied with all relevant government regulations, and that the FBI engaged in no illegal conduct.

Therefore, I am ordering the FBI to turn over to the Court, for *in camera* inspection, the document listed as Document No. 4 in Exhibit B of the FBI's Notice of Motion, the one-page FBI airtel dated January 6, 1984, along with the 17 additional pages attached. I am also ordering the FBI to submit for *in camera* inspection the document listed as Document No. 5 in Exhibit B of the FBI's Notice of Motion, the one-

page FBI airtel dated December 5, 1985, along with the five additional pages attached. The documents and the attached pages should be submitted to the Court in complete and unredacted form.

While I do not resort to *in camera* inspection lightly, I believe in this case that *in camera* inspection of the specified documents is the best means available to render substantial justice to plaintiff's claims, yet also insure that any legitimate intelligence activities, sources or methods of the government remain protected against public disclosure.

After reviewing the specified documents *in camera,* as well as the affidavit ordered by the Court at oral argument, I will then issue a formal opinion addressing the FBI's summary judgment motion in its entirety.

Very truly yours,
ALFRED M. WOLIN
U.S.D.J.

AMW:bv

### ORDER

In conformity with this Court's letter to counsel dated December 30, 1988,

It is on this 30th day of December, 1988,

ORDERED that defendant FBI turn over to the Court, for *in camera* inspection, the document listed as Document No. 4 in Exhibit B of the FBI's Notice of Motion, the one-page FBI airtel dated January 6, 1984, along with the 17 additional pages attached, and it is further

ORDERED that defendant FBI submit for *in camera* inspection the document listed as Document No. 5 in Exhibit B of the FBI's Notice of Motion, the one-page FBI airtel dated December 5, 1985, along with the five additional pages attached, and it is further

ORDERED that the specified documents and attached pages should be submitted to the Court in complete and unredacted form within 21 days of the date of this order.