Paul GREENBERG, Frederic Henderson, Richard Albright, Elliot Greenspan, Stephen Komm, Karl L. Foster, and Jeffrey Steinberg, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF TREASURY, United States Department of Justice, United States Department of State, and Central Intelligence Agency, Defendants.

No. Civ. A. 87–898 SSH.

United States District Court, District of Columbia.

July 1, 1998.

6

James H. Lesar, Washington, DC, for Plaintiffs.

Susan A. Nellor, Asst. U.S. Atty., Washington, DC, for Defendants.

### *OPINION*

STANLEY S. HARRIS, District Judge.

This matter is before the Court on defendants' motion for summary judgment filed August 24, 1990, and plaintiffs' motion for partial summary judgment and for an order compelling further searches and *Vaughn* indices, filed January 9, 1992. Subsequent to the filing of these motions, the defendant agencies agreed to release a substantial number of documents and provide numerous supplemental *Vaughn* indices, thus prompting the Court to delay ruling on the motions. After the additional releases, the Court requested that the parties file supplemental memoranda indicating which issues raised in their dispositive motions were still contested. The supplemental memoranda significantly narrowed the remaining points of contention. Upon consideration of the original motions for summary judgment as modified by the supplemental pleadings, and the entire record, the Court grants defendants' motion for summary judgment in part and denies it in part, and grants plaintiffs' motion for partial

summary judgment and further searches and *Vaughn* indices in part and denies it in part, in accordance with the reasoning set forth below.[1]

## BACKGROUND[2]

On April 1, 1985, six of the seven plaintiffs in this action, individuals associated with the weekly magazine *Executive Intelligence Review*, submitted Freedom of Information Act ("FOIA") requests to five federal agencies: the United States Secret Service ("Secret Service"), the United States Customs Service ("Customs"), the Federal Bureau of Investigation ("FBI"), the United States Attorney's Office for the Southern District of New York ("USAO–SDNY"), and the Department of State.[3] An identical request was made by plaintiff Jeffrey Steinberg to the Central Intelligence Agency ("CIA") in April 1987. Each request sought the following information:

1. Any and all documents pertaining to CYRUS HASHEMI, an Iranian citizen formerly residing in the United States. . . .

2. Any and all documents pertaining to the FIRST GULF BANK AND TRUST (West Indies) LIMITED, previously known as the FIRST ARABIAN BANK AND TRUST before October 5, 1979. . . .

3. Any and all documents, from October 12, 1979, to January 20, 1981, pertaining to the taking of 53 American hostages in Iran as well as negotiations to secure their release, which refer to CYRUS HASHEMI and/or ABOLFAZL "BAHRAM" NAHIDIAN.

4. Any and all documents pertaining to the assassination of ALI AKBAR TABATABAI which occurred on July 22, 1980, . . . which refer to CYRUS HASHEMI and/or ABOLFAZL "BAHRAM" NAHIDIAN.

5. Any and all documents, from 1979 to the present, referring to actual or potential violations of law regarding the export of weapons and military spare parts to Iran, which refer to CYRUS HASHEMI, CYRUS DAVARI, REZA HASHEMI and/or JOHN STANLEY POTTINGER.

6. Any and all documents pertaining to the loss or disappearance of tape recordings of meetings between JOHN STANLEY POTTINGER and CYRUS HASHEMI and/or REZA HASHEMI, as referred to in the enclosed article from the *Washington Post* dated July 18, 1981.

In a nutshell, plaintiffs sought information relating to the involvement of the above-named individuals in the so-called "October Surprise" allegations—the charges that the Reagan/Bush campaign made a secret deal with Iranian leaders during the 1980 campaign to delay the release of American hostages until after the election.

Each of the defendant agencies acknowledged plaintiffs' FOIA requests. Most of the agencies immediately processed the relevant request and searched their files for responsive records.[4] The agencies then either released the documents or withheld them, in whole or in part, pursuant to a FOIA exemption. In certain cases, the agencies refused to confirm or deny the existence of records mentioning the named individuals, contending that to do so would violate the individuals' personal privacy. Each agency informed plaintiffs of their right to appeal the agency's final decision. In most, but not all, cases, plaintiffs filed an administrative appeal of the

---

1. The Court also grants, *nunc pro tunc*, plaintiffs' motion for leave to late file their supplemental memorandum.

2. The individual agencies' handling of plaintiffs' FOIA requests is described in greater detail in the portion of the Court's Opinion discussing plaintiffs' claims against the individual agencies.

3. Richard A. Albright, Jr., sent a request to the FBI Headquarters Office ("FBIHQ"), Frederic Henderson sent a request to the FBI Washington Field Office, ("FBIWFO"), Stephen Komm sent a request to the Secret Service, Paul Greenberg sent a request to the Customs Service, Karl L.

Foster sent a request to the State Department, and Elliot Greenspan sent a request to the USAO–SDNY, which forwarded the request to the Department of Justice's Justice Management Division's Referral Unit. The request was ultimately referred to the Executive Office for United States Attorneys ("EOUSA").

4. Plaintiffs received no response, other than a letter informing them that the request had been forwarded to the Department of Justice for processing, from the USAO–SDNY until after this lawsuit was filed.

agency decision, which was ultimately rejected.[5]

Plaintiffs filed the instant action on April 1, 1987.[6] In the ensuing years, the agencies have continued to release responsive documents, re-evaluate their claimed exemptions, and submit declarations supporting documents which were withheld or redacted, both voluntarily and pursuant to court order.[7]

## STANDARD OF REVIEW

■ Summary judgment may be granted only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is available to a defendant in a FOIA case if the agency proves that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester. *Miller v. Department of State,* 779 F.2d 1378, 1382 (8th Cir.1985) (citing *Weisberg v. Department of Justice,* 705 F.2d 1344, 1350 (D.C.Cir.1983) [hereinafter *"Weisberg I"*] ). In order to discharge its FOIA obligations, the agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1978) (quoting *National Cable Television Ass'n. Inc. v. FCC,* 479 F.2d 183, 186 (D.C.Cir.1973)), *cert. denied,* 445 U.S. 927 , 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

## DISCUSSION

### A. *Executive Order Governing Exemption 1 Claims*

■ Several of the agencies withheld information in the interests of national security pursuant to Exemption 1 of the FOIA. Exemption 1 provides that the mandatory disclosure provisions of the FOIA do not apply to matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Thus, the classification standard to be applied depends on the relevant Executive Order. *See King v. Department of Justice,* 830 F.2d 210, 214 (D.C.Cir.1987); *Lesar v. Department of Justice,* 636 F.2d 472 (D.C.Cir. 1980).

In this case, the agencies relied upon Executive Order 12356 when making decisions regarding the classified status of the documents. *See, e.g.,* Declaration of Katherine M. Stricker ¶¶ 8–11 (Oct. 18, 1991) [hereinafter "Stricker Decl."]; Declaration of Richard D. Davidson ¶ 3 (Apr. 29, 1993); *see also* Exec. Or. 12,356, 47 Fed.Reg. 14874 (1982). On April 17, 1995, President Clinton signed a new Executive Order on national security classification, Executive Order 12,958. *See* Exec. Order No. 12,958, 60 Fed.Reg. 19825 (1995). Plaintiffs contend that the agencies should be ordered re-review their Exemption 1 claims under Executive Order 12,958.

■ The D.C. Circuit has fashioned a "two-tiered" approach to determine which Executive Order a reviewing court should apply in evaluating an agency's Exemption 1 claims. *See King,* 830 F.2d at 217. As a general rule, a reviewing court should assess the propriety of an Exemption 1 classification decision "in terms of the executive order in force at the time the agency's ultimate classification decision is actually made." *Id.; see also Bonner v. Department of State,* 928 F.2d

---

5. Plaintiffs did not appeal the determination made by the Secret Service or the State Department. Plaintiffs also did not appeal some of the FBI's withholdings and redactions.

6. An amended complaint, adding plaintiff Steinberg and defendant CIA, was filed on May 6, 1987.

 Both parties agree that, during the years this case has been pending, all points of contention between plaintiffs and the Secret Service have been eliminated. The Court, therefore, grants defendants' motion for summary judgment on all claims against the Secret Service.

7. Both parties agree that, during the years this case has been pending, all points of contention between plaintiffs and the Secret Service have been eliminated. The Court, therefore, grants defendants' motion for summary judgment on all claims against the Secret Service.

1148, 1152–53 (D.C.Cir.1991) (holding that an agency's decision to withhold documents "ordinarily must be evaluated as of the time it was made"). A court may only insist that the government reclassify documents to comply with a superseding Executive Order if it "remand[s] the case to the agency to correct a deficiency in its classification determination." *King*, 830 F.2d at 217.

■ The Court, therefore, will evaluate the propriety of the agencies' Exemption 1 withholdings under Executive Order 12356 unless the Court finds that the agencies improperly withheld information pursuant to Exemption 1, in which case, on remand for reclassification, the agencies will be ordered to evaluate the documents under Executive Order 12,958.[8] *See id.; see also Fulbright & Jaworski v. Department of Treasury*, 545 F.Supp. 615, 619 (D.D.C.1982).

## B. *Central Intelligence Agency*

### 1. Referrals

Plaintiffs contend that the CIA has not accounted for documents that it referred to the United States Information Agency, the National Security Agency, and the Department of the Army. Defendants admit that the CIA has referred a total of seven documents to those three agencies and that deletions from those documents have not been defended in previous filings. Defendants, therefore, are directed to submit declarations to justify the redactions from the referred documents.

### 2. "Twilight Zone" Documents

Plaintiffs next ask the Court to require the CIA to account for certain documents that

plaintiffs believe exist but which have not been produced. Plaintiffs allege that the CIA did not produce four CIA documents which were provided on June 21, 1983, to plaintiffs in the civil suit *Hashemi v. Campaigner Publications*, 572 F.Supp. 331 (N.D.Ga.1983), by the United States Attorney for the District of Columbia, or four documents which were declassified and released as part of the *Report of the Congressional Committees Investigating the Iran/Contra Affair* (1987).[9] Plaintiffs' claim amounts to a contention that the CIA did not adequately search its records for responsive documents. Defendants counter that the CIA conducted a reasonable search for these documents, which satisfied its FOIA obligation.[10]

■ Under the FOIA, an agency has a duty to conduct a reasonable search for responsive records. *Oglesby v. Department of the Army*, 920 F.2d 57, 68 (D.C.Cir.1990); *Weisberg I*, 705 F.2d at 1350. The burden is on the government to demonstrate that it has thoroughly searched for the requested documents where they might reasonably be found. *Krikorian v. Department of State*, 984 F.2d 461, 468 (D.C.Cir.1993); *Weisberg I*, 705 F.2d at 1351. An agency is not, however, "required to reorganize its files in response to a plaintiff's request in the form in which it was made." *Church of Scientology v. IRS*, 792 F.2d 146, 150–151 (D.C.Cir.1986) (internal quotation omitted); *see also McGehee v. CIA*, 697 F.2d 1095, 1100 (D.C.Cir.), *modified in part*, 711 F.2d 1076 (D.C.Cir.1983).

■ An agency may prove the reasonableness of its search through affidavits of responsible agency officials which are rela-

---

8. It is of no moment that plaintiffs may file a new FOIA request today and thereby force the agencies to re-review the documents under the new Executive Order. The Court's ordering defendants to re-review the documents is not the same as filing a new FOIA request, because if plaintiffs follow the latter route they "will stand in line behind other FOIA requesters .... [u]nless the .(agencies) unlawfully withheld information in [their] prior responses, a court has no warrant to place [plaintiffs] at the head of the current [agency] FOIA queue." *Bonner*, 928 F.2d at 1153.

9. These missing documents are referred to as the "twilight zone" documents.

10. Plaintiffs claim that defendants admitted to not searching for the twilight zone documents. Defendants, in their pleadings, state that "[i]t is apparent that the eight documents simply were not located in CIA's search of its records." The Court interprets this statement to mean that the CIA did in fact conduct a search, contrary to plaintiffs' interpretation. In an abundance of caution, however, the Court notes that if the Court's interpretation of defendants' statement is incorrect, defendants should inform the Court within five days of the date of this opinion.

tively detailed, nonconclusory, and submitted in good faith. *Steinberg v. Department of Justice*, 23 F.3d 548, 551 (D.C.Cir.1994); *see also Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 890 (D.C.Cir.1995) (affidavits should set forth search terms and the type of search performed, and aver that all files likely to contain material were searched). Once the agency has shown by convincing evidence that its search was reasonable, the burden shifts to the requester to show that the search was not in fact in good faith. *Weisberg I*, 705 F.2d at 1351.

■ In this case, the CIA furnished affidavits by a responsible officer, Katherine M. Stricker, the Information Review Officer for the Directorate of Operations at the CIA, setting forth the search procedures used to respond to plaintiff Steinberg's request. Stricker's affidavits explain that the agency immediately conducted a search of CIA records for items 1 and 2 of plaintiff Steinberg's FOIA request. Stricker Decl. ¶ 3. The CIA was not, however, able to search items 3, 4, 5, and 6 as written; such a search would have required "extensive research cross-indexing particular bits of information to specific events, incidents or activities" because the CIA records systems are not indexed in a manner such that responsive records could have been located. *Id.* The CIA advised Steinberg that it could not conduct searches in the manner requested, but offered to conduct a broader search for all information it might have indexed to the names of various individuals and entities listed in his request. *Id.* Steinberg never responded. *Id.* Because the CIA did not receive a response, it did not immediately make a further search. On March 23, 1992, however, the CIA conducted another search for records indexed to the names of individuals listed in Steinberg's FOIA request, such as "Reza Hashemi, Abolfazl 'Bahram' Nahidian, Cyrus Davari, Stanley Pottinger and Ali Akbar Tabatabai." Supplemental Declaration of Katherine M. Stricker ¶ 3 (February 26, 1993) [hereinafter "Stricker II Decl."]. These searches produced a total of 326 responsive documents, but not the "twilight zone" documents.[11]

■ Based on the Stricker affidavits, the Court finds that the CIA has met its burden to demonstrate that it has thoroughly searched for the requested documents where they might reasonably be found. *See Krikorian*, 984 F.2d at 468; *Weisberg I*, 705 F.2d at 1351. Thus, summary judgment on the issue of the adequacy of the search is proper unless plaintiffs can contradict the CIA's account of the search procedure or raise evidence of the CIA's bad faith. *See, e.g., Founding Church of Scientology of Washington D.C., Inc. v. National Security Agency*, 610 F.2d 824, 836 (D.C.Cir.1979); *Goland*, 607 F.2d at 352–355; *Miller*, 779 F.2d at 1384. Plaintiffs have attempted to prove the CIA's bad faith by proffering evidence of the existence of the "twilight zone" documents.

The fact that the CIA's search failed to turn up eight documents is not, however, sufficient to contradict the reasonableness of the CIA's search without more evidence of bad faith. *See Meeropol v. Meese*, 790 F.2d 942, 952–53 (D.C.Cir.1986) ("[A] search is not unreasonable simply because it fails to produce all relevant material; no [large] search ... will be free from error."); *Miller*, 779 F.2d at 1385 (An agency "is not required ... to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found."). The fundamental question is "not 'whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate.'" *Steinberg*, 23 F.3d at 551 (quoting *Weisberg v. Department of Justice*, 745 F.2d 1476, 1485 (D.C.Cir.1984) [hereinafter *Weisberg II*]) (emphasis omitted). "The fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it." *Miller*, 779 F.2d at 1385. Although the CIA has not been able to find the supposed "twilight zone" documents, it is

---

11. The original search located 277 documents. The second search located an additional 49 documents. Stricker Decl. ¶ 4; Stricker II Decl. ¶ 3.

clear that the CIA's search efforts were reasonably calculated to track them down.[12] Plaintiffs' evidence is not sufficient to rebut the demonstrated adequacy of the CIA's search, and therefore defendants are entitled to summary judgment on this issue. *See Weisberg I,* 705 F.2d at 1351–52; *Goland,* 607 F.2d at 352.

### 3. Exemption 1 Claims

After processing Steinberg's FOIA request, the CIA determined that virtually all of the documents should be withheld pursuant to Exemption 1 of the FOIA. The CIA claims that its invocation of Exemption 1 is proper because the documents withheld are properly classified in accordance with Executive Order 12356. As previously discussed, Exemption 1 of the FOIA protects from mandatory disclosure records that are "specifically authorized under an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Plaintiffs dispute the CIA's reliance on Exemption 1. As an initial matter, plaintiffs argue that the CIA's *Vaughn* index provides an insufficient basis for the Court to evaluate the agency's Exemption 1 claims. In addition, plaintiffs claim that the CIA has improperly invoked Exemption 1; they argue that the CIA was not concerned about national security when it withheld the documents, but rather that the CIA improperly classified the information in order to prevent embarrassment to the government.

 The Court reviews *de novo* all exemption claims, and the agency bears the burden of justifying its decision to withhold requested information. 5 U.S.C. § 552(a)(4)(B); *King,* 830 F.2d at 217. An agency may meet its burden by filing de-

tailed affidavits describing the material withheld and why it falls under the exemption claimed. *King,* 830 F.2d at 217; *PHE, Inc. v. Department of Justice,* 983 F.2d 248, 250 (D.C.Cir.1993); *Hayden v. National Sec. Agency,* 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). Because Exemption 1 deals with national security issues, the Court gives substantial weight to detailed agency explanations. *Krikorian,* 984 F.2d at 464; *Miller v. Casey,* 730 F.2d 773, 776 (D.C.Cir. 1984); *see also* S.Rep. No. 1200, 93d Cong., at 12 (2d Sess.1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6290. The affidavits are only entitled to this extra weight, however, if:

> (1) [T]he agency affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed, and (2) the affidavits are neither controverted by contrary record evidence nor impugned by bad faith on the part of the agency.

*King,* 830 F.2d at 217 (internal citations omitted).

 The threshold issue, therefore, is whether the CIA's *Vaughn* index is sufficient to allow the Court to evaluate the Exemption 1 claims. *Id.* at 219. The Court concludes that, in light of the Court of Appeals' decision in *King,* the CIA's current *Vaughn* index is insufficient to allow the Court to engage in such an evaluation. Therefore, the CIA is directed to file a supplemental *Vaughn* index more specifically cross-referencing the reasons that each document is being withheld or redacted pursuant to Exemption 1.[13] Where several paragraphs are referenced for a particular document, the Court requests clarification as to whether each of those paragraphs is relevant to the particular document.[14] If only some of the

---

12. The missing documents all contain references to either the First Gulf Bank & Trust Company, Abolfazl "Bahram" Nahidian, or Cyrus Hashemi. The CIA included all these names in its search. Stricker Decl. ¶ 3; Stricker II Decl. ¶ 3.

13. The Court also notes that the CIA may wish more specifically to explain why other portions of documents which are totally withheld are not "reasonably segregable," in light of the Court of Appeals' recent emphasis on their requirement

that district courts make segregability determinations with respect to documents which are withheld in full. *See, e.g., Summers v. Department of Justice,* 140 F.3d 1077, 1081 (D.C.Cir.1998); *Kimberlin v. Department of Justice,* 139 F.3d 944, 949–50 (D.C.Cir.1998).

14. For example, it appears that each time a document is withheld because it may lead to information about CIA field installations, paragraphs 28–31 are all cited as reasons. Para-

referenced paragraphs are relevant, the Court requests that the CIA reference only such paragraph(s). *See King*, 830 F.2d at 224–225. Finally, it would be helpful if the paragraphs containing more than one explanation were broken into separate paragraphs so that they may be specifically cross-referenced.[15] *See id.* at 221–223 & nn. 92–94; *Scott v. CIA*, 916 F.Supp. 42, 47–49 (D.D.C. 1996). In light of this request, the Court reserves judgment on whether the CIA's Exemption 1 claims are valid until the CIA has submitted a supplemental *Vaughn* index in compliance with *King*, and plaintiffs have had an opportunity to refine their objections based on the new information.[16]

### 4. Exemption 5 Claims

Plaintiffs have also challenged the CIA's decision to withhold six documents pursuant to the "deliberative process privilege" incorporated in Exemption 5 of the FOIA.[17] *See* 5 U.S.C. § 552(b)(5). Defendants claim that the CIA's *Vaughn* index clearly demonstrates that the CIA properly asserted the Exemption 5 deliberative process privilege with respect to the six documents at issue, and thus defendants are entitled to summary judgment. The Court agrees with defendants with regard to Documents 90 and 160, but denies defendants' request for summary judgment on the remaining documents.

Under Exemption 5, an agency may withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption incorporates the government's common law privileges against discovery in litigation, including the deliberative process privilege which "protects the 'deliberative or policymaking processes' of governmental agencies." *Access Reports v. Department of Justice*, 926 F.2d 1192, 1194 (D.C.Cir.1991); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

In order to invoke the deliberative process privilege, an agency must prove that the document withheld is both predecisional and deliberative. *See Mapother v. Department of Justice*, 3 F.3d 1533, 1537 (D.C.Cir.1993); *Petroleum Info. Corp. v. Department of the Interior*, 976 F.2d 1429, 1434 (D.C.Cir.1992). A document is predecisional if it was created "antecedent to the adoption of an agency policy." *Jordan v. Department of Justice*, 591 F.2d 753, 774 (D.C.Cir.1978) (*en banc* ). A document is "deliberative" if it "makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143–44 (D.C.Cir. 1975); *see also Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980) (holding that a document is

graph 29 only is relevant when the installation is on foreign soil. It is unclear whether all the documents deal with a foreign installation, or whether the citation "paragraphs 28–31" is a categorical citation used every time. Similarly, when a document is withheld because it may reveal an intelligence source, paragraphs 20–24 are all cited, even though paragraph 22 only applics when the identity of the source would reveal the type of information contained in the document.

15. For example, paragraph 20 cites as reasons for withholding intelligence sources that (1) sources will not come forward if the CIA does not keep them confidential, (2) the source must be kept secret because otherwise the individual would suffer serious embarrassment and loss of business if his or her involvement were publicized, and (3) the source is a foreign national cooperating without the knowledge of his or her government. *See* Stricker Decl. ¶ 20. Similarly, a citation to paragraph 28 would not enable a requester to distinguish documents which dis-

cuss field installations used to further the foreign intelligence activities of the CIA from those concerned with personnel recruiting or security matters. *See* Stricker Decl. ¶ 28.

16. The Court notes that this request is not an order remanding the documents for reclassification, and thus the CIA is not required to re-evaluate the documents under Executive Order 12,958. *See King*, 830 F.2d at 217. Should the CIA determine that it cannot provide more specificity without endangering national security, the Court suggests that the CIA may elect to submit a classified affidavit for *in camera* review.

17. Plaintiffs challenge documents 62, 90, 140, 141, 160, and 201. Document 198 was also withheld based on Exemption 5. However, plaintiffs do not challenge that decision. Defendants also relied on the attorney-client privilege in withholding documents under Exemption 5, but plaintiffs have not challenged these claims of privilege.

deliberative if it "reflects the give-and-take of the consultative process"). To achieve summary judgment on this issue, the CIA must identify the deliberative process involved and the role played by each document in the course of that process.[18] *Coastal States*, 617 F.2d at 868.

The CIA is entitled to summary judgment on Document 90, two pages of undated notes "contain[ing] a series of questions and issues which were to be addressed by Agency policy makers in arriving at a decision." Stricker Decl. at p. 89. It is clear from this description that the document is predecisional and that it was created to assist in the deliberative process. Plaintiffs argue that the document is not "deliberative" because, although the questions were designed to be used in reaching a decision, the declaration indicates that they were never actually used. Plaintiffs' argument overlooks the fact that the key question in evaluating the deliberative process privilege is whether disclosure of the material would discourage candid discussion within an agency. *Petroleum Info.*, 976 F.2d at 1434; *Access Reports*, 926 F.2d at 1195. Even assuming, as the Court must in evaluating a motion for summary judgment, that the questions were never used, at the time they were written the author did not know that his or her work would not be considered. If the author had known that the notes discussing the proposed questions and issues would be subject to FOIA disclosure if not actually used, the author likely would have been more cautious in what he or she recommended. *See Access Reports*, 926 F.2d at 1196. Moreover, even though the questions were never used, their disclosure may expose the thought process of CIA officials in the deliberative process by illustrating the possible course of the CIA's reasoning. *See Petroleum Info.*, 976 F.2d at 1434 (noting that even hard facts may be withheld pursuant to the deliberative process exemption if their disclosure would "expose the deliberative process within an agency"); *id.* at 1438 (noting that it is proper not to disclose information which "if revealed, would unveil the agency's reasoning by showing what it considered relevant (and irrelevant)"). Document 90, therefore, was properly withheld by the CIA pursuant to Exemption 5 of the FOIA.[19]

Summary judgment is also appropriate for Document 160, a note with a routing sheet dated December 19, 1985. Information in the note "discusses deliberations by Government officials in examining policy concerning contacts with Mr. Hashemi." Stricker Decl. at pp. 121–122. This description indicates that the document describes the decision-making process undertaken by the CIA when it was considering the propriety of contacting Mr. Hashemi—a policy decision by the CIA. As such, it falls squarely within Exemption 5.

The remainder of the challenged Exemption 5 claims are not, however, appropriate for summary judgment. With respect to Documents 62 and 201, the CIA has failed to identify the deliberative process involved and the role played by the documents in that process. *Coastal States*, 617 F.2d at 868.

---

18. The agency need not pinpoint a particular final decision to which the material contributed. *See Access Reports*, 926 F.2d at 1196. The Court is aware of the fact that the CIA is very vague when it discusses—the decisions at issue—the *Vaughn* index usually just says that the materials were used "in arriving at a decision." Normally, the Court would request more specific information about the particular decision. It is clear in this case, however, that the CIA is concerned that any further information about the decisions would threaten national security. Agency affidavits are entitled to "substantial weight" in national security cases when they aver that identified documents are exempt. *Goland*, 607 F.2d at 339. Thus, the Court will not require a more specific explanation of the decision to which the document contributed.

19. Plaintiffs suggest that if the names of the parties involved are redacted, any "chilling" effect on the author would be removed. Exemption 5, however, is not limited to preventing embarrassment or "chilling" of the individual authors of deliberative documents. The key inquiry is "whether disclosure of the requested material would tend to 'discourage candid discussion within an agency.'" *Petroleum Info.*, 976 F.2d at 1434 (quoting *Access Reports*, 926 F.2d at 1195). The redaction of the authors' names would not eliminate the effect that the release of these documents, illustrating the CIA's decision-making process, would have on the candor of future deliberations at the CIA.

The first Stricker declaration states that Document 62 "mentions" a proposed draft of a cable which contains deliberative material. Stricker Decl. at p. 72. A document just mentioning a proposed draft cannot be properly characterized as "reflect[ing] the give-and-take of the consultive process." *Coastal States,* 617 F.2d at 866. Similarly, Document 201 was withheld because it "discusses legal actions being considered concerning Hashemi." Stricker Decl. at p. 139. The Court is mindful that the deliberations leading to a decision to initiate, or to forego, legal action is within the scope of Exemption 5. *See Senate of the Commonwealth of Puerto Rico v. Department of Justice,* 823 F.2d 574, 585 n. 38 (D.C.Cir.1987). The CIA's *Vaughn* index, however, is not clear as to whether the document is an evaluation of the legal status, in which case it would be protected, or an instruction from a senior to a junior official as to what legal action should be taken—a final decision which does not merit Exemption 5 protection. *See Sears,* 421 U.S. at 152–155, 95 S.Ct. 1504; *Access Reports,* 926 F.2d at 1195. Therefore, if the CIA wishes to continue asserting Exemption 5 with respect to these documents, it must more fully describe the deliberative process involved.

 Summary judgment is also not available for Documents 140 and 141. These documents include "discussions" about negotiations with Hashemi's lawyer. Stricker Decl. at pp. 112–113. The Court of Appeals has made it clear that, although documents which reveal an agency's "internal self—evaluation" of negotiations fall within Exemption 5, factual information about negotiations between an agency and an outside party does not. *Mead Data Central, Inc. v. Department of the Air Force,* 566 F.2d 242, 257 (D.C.Cir. 1977); *see also Senate of Puerto Rico,* 823 F.2d at 587. A claim of secrecy for a proceeding between an agency and an outside party does not implicate the policy objectives which Exemption 5 is designed to serve: avoiding premature disclosure of agency decisions and encouraging the free exchange of ideas among administrative personnel. *See Senate of Puerto Rico,* 823 F.2d at 587; *Mead Data,* 566 F.2d at 257–258. It is impossible to tell from the CIA's *Vaughn* index whether Documents 140 and 141 are evalua-

tions of the negotiation process or factual descriptions. The CIA must provide more detailed information about the content of these documents, assuming it wishes to continue to assert Exemption 5.

### 5. Plaintiffs' Request for a Reno Guidelines Review

Plaintiffs claim that the parties agreed to a re-review of all CIA documents under the 1994 Reno guidelines, a memorandum by Attorney General Janet Reno expressing a Clinton administration policy favoring disclosure. Although defendants claim, and plaintiffs do not appear to dispute, that the memorandum created no rights in individual litigants, plaintiffs insist that they are entitled to such review because defendants agreed to it. The Court simply does not have a basis upon which to evaluate this claim. Plaintiffs proffer no evidence of this alleged agreement. Defendants do not address any agreement, or the effect such agreement would have on their duty to re-review the CIA documents. Due to the state of the record, the Court cannot evaluate the Reno review issue at this time. If plaintiffs wish to continue to assert their entitlement to a Reno review, the parties are free to submit supplemental pleadings briefing the subject, and the Court will evaluate the claim thereafter.

### 6. Referrals to the CIA from other Agencies

Plaintiffs' final claim against the CIA is that the agency has failed to account for all documents it has received as referrals from other agencies. Plaintiffs offer no evidence in support of this contention, other than their "belief" that there are other referrals. Plaintiffs unsupported assertion is simply not sufficient to raise an inference that the CIA has not met its duty under the FOIA. The Court will not address plaintiffs' referral claim unless and until plaintiffs provide some evidence indicating that their claim has merit.

### C. *United States Customs Service*

### 1. *Vaughn* Index for Documents Referred to Customs

Plaintiffs claim that Customs has not met its duty under the FOIA because it has not

accounted for documents which were referred to Customs by the EOUSA for review and processing. Plaintiffs cite as evidence the EOUSA's *Vaughn* indices, which state that 687 pages of material were referred to Customs, as compared to Customs' *Vaughn* indices, which only account for 147 pages. *Compare* Supplemental Declaration of Bonnie Gay ¶ 6 (Mar. 8, 1996) [hereinafter "Gay III Decl.]" *and* Supplemental Declaration of Bonnie Gay ¶ 6 (Oct. 6, 1995) [hereinafter "Gay II Decl.]" *with* Declaration of Kathryn C. Peterson Ex. 2 (Nov. 3, 1994).

Defendants argue that Customs has produced a *Vaughn* index for all document referrals from the EOUSA, citing a letter from Customs to plaintiffs' counsel dated November 1994. *See* Third Supplemental Declaration of Bonnie Gay ¶ 5 (July 18, 1997) [hereinafter "Gay IV Decl.]". Defendants, however, do not address the fact that the letter to which they refer only deals with 147 pages of documents. Customs still has not accounted for 540 pages of referred documents. Therefore, Customs is directed to produce a *Vaughn* index for the missing referred documents, or otherwise to show cause why such an index should not be produced.

## 2. *Vaughn* Index for Documents Referred from Customs

Customs referred two documents to other agencies, one to the Foreign Assets Control Office of the Treasury Department, and one to the Criminal Division of the Department of Justice, who in turn referred the document to the EOUSA. These documents have not been accounted for in Customs' *Vaughn* index or by either of the agencies to which they were referred. Plaintiffs contend that Customs has a duty to account for these documents.

 It is well-settled in our circuit that "when an agency receives a FOIA request for 'agency records' in its possession, it must take responsibility for processing the request[;][i]t cannot simply refuse to act on the ground that the documents originated elsewhere." *McGehee*, 697 F.2d at 1110; *see also Paisley v. CIA*, 712 F.2d 686, 691 (D.C.Cir.1983), *vacated in part*, 724 F.2d 201

(D.C.Cir.1984); *Williams v. FBI*, 1993 WL 157679 at *1 (D.D.C.1993). Thus, even though Customs referred these documents to other agencies for review and processing, Customs is still responsible for explaining their non-production. Customs must submit a *Vaughn* index to account for the two missing documents. *See Williams*, 1993 WL 157679 at *1 (ordering the FBI to explain why document referred to another agency was withheld).

## 3. Plaintiffs' Requests for *Ladano* and Reno Reviews

Plaintiffs next contend that the Court should order Customs to re-review documents withheld under the new standards articulated in Attorney General Reno's 1994 memorandum and the Supreme Court's decision in *Department of Justice v. Ladano*, 508 U.S. 165, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993). Defendants argue that they are under no duty to re-review documents under the Reno guidelines, and that they have met their duty under *Landano* because Customs "clearly demonstrated" the confidential nature of the information withheld pursuant to Exemption 7(D).

The Court reiterates that it will not order defendants to re-review any documents under the 1994 Reno guidelines until plaintiffs have submitted supplemental pleadings citing evidence of an enforceable agreement between the parties or explaining why defendants should otherwise be forced to re-review in light of the Reno guidelines.

The Court also will not order defendants to re-review Customs documents in light of the Supreme Court's *Landano* opinion. The *Landano* decision dealt with Exemption 7(D) of the FOIA, which permits agencies to withhold documents which "could reasonably be expected to disclose the identity of a confidential source." 5 U.S.C. § 552(b)(7)(D). The Supreme Court held that an agency cannot withhold documents in reliance on Exemption 7(D) and only cite as support the presumption that every individual who cooperates with an agency in a criminal investigation assumes that his or her identity will be held confidential. *Landano*, 508 U.S. at 174,

113 S.Ct. 2014. Rather, if an agency wishes to invoke Exemption 7(D), it must either make an individualized showing of confidentiality or point to narrowly defined circumstances that will support an inference of confidentiality for each source. *Id.* at 175–179, 113 S.Ct. 2014.

 Customs has net its burden under *Ladano.* Customs' *Vaughn* index explains that the agency invoked Exemption 7(D) in two situations: (1) the source had expressly requested confidentiality, and (2) the source had told Customs that he had been threatened and had received an anonymous telephone call saying there was a "contract to hit" out on him. Peterson Decl. ¶ 17. Thus, Customs has met its *Landano* burden by either making an individualized showing of confidentiality or "point[ing] to ... narrowly defined circumstances that will support the inference [of confidentiality]" for each source. *Landano,* 508 U.S. at 179, 113 S.Ct. 2014.

### 4. Adequacy of Customs' Search for Documents

Finally, plaintiffs contend that Customs' search for responsive documents was inadequate. Defendants claim that their affidavits demonstrate the adequacy of Customs' search and argue that plaintiffs' "missing document" allegations are not sufficient to preclude summary judgment in defendants' favor. These arguments are essentially the same as those discussed previously with respect to the adequacy of the CIA's search. Because of the differences between the two agencies' *Vaughn* indices, however, unlike the CIA, Customs is not entitled to summary judgment in its favor.

 An agency has the burden of demonstrating that it conducted a reasonable search for responsive records. *Krikorian,* 984 F.2d at 468; *Weisberg I,* 705 F.2d at 1350–51. If the agency can demonstrate that its search was reasonable, it is entitled to summary judgment unless the requestor can rebut its evidence by a showing that the

search was not in good faith. *See Oglesby,* 920 F.2d at 68; *Weisberg I,* 705 F.2d at 1351. If, however, the agency has not made a sufficient showing, a requestor can avert a granting of summary judgment by demonstrating some reason to think that the documents would have turned up if the agency had looked for them. *See Weisberg I,* 705 F.2d at 1351; *Miller,* 779 F.2d at 1383.

 Customs has not met its initial burden to show that it made an adequate search of its records in this case. Customs' *Vaughn* index does not describe the type of search conducted, the search terms used, or which files were searched. *See Steinberg,* 23 F.3d at 551–52 (description of search inadequate when it failed "to describe in any detail what records were searched, by whom, and through what process"); *Oglesby,* 920 F.2d at 68 (affidavits should set forth search terms and type of search performed, and aver that all files likely to contain material were searched). Because Customs has not demonstrated that it conducted a reasonable search for responsive records, plaintiffs can evade summary judgment by proffering evidence that more documents would have turned up had the agency performed an adequate search. *See Weisberg I,* 705 F.2d at 1351; *Miller,* 779 F.2d at 1383. Plaintiffs can meet this burden by "showing that [a missing] document originated with the agency or that the agency is set up to retrieve just that kind of document." *Miller,* 779 F.2d at 1383. In this case, plaintiffs cite evidence that EOUSA referred 687 pages to Customs to review and process, while Customs only accounted for 147 pages of documents. This evidence is sufficient to raise a question as to the adequacy of Customs' search for responsive documents. Accordingly, Customs is directed either to perform a new search for documents responsive to plaintiffs' FOIA request or to submit a new *Vaughn* index which describes the search in sufficient detail to allow this Court to evaluate the adequacy of the search.[20]

20. The Court notes that Customs' current *Vaughn* index, consisting of the Peterson declaration and attached exhibits, is not helpful in the Court's assessment of the propriety of the claimed exemptions. The Court requests that

any further *Vaughn* indices cross-index the exemptions claimed for a particular document to the specific reasons for the exemption. Although the current *Vaughn* index provides a list of the reasons for claiming each exemption in a general

## D. Executive Office of United States Attorneys

### 1. Documents Referred by the EOUSA

 Plaintiffs claim that the EOUSA's *Vaughn* index, which describes documents the EOUSA referred to other agencies, is inconsistent in that it states that 8,737 pages have been referred, but accounts for only some of those in a chart describing the referrals by agency. Plaintiffs further note that a large number of the documents which the EOUSA referred to various agencies have not been accounted for by those agencies or the EOUSA. Defendants' only response is to refer the Court to the Supplemental Declaration of Bonnie Gay, sworn March 8, 1996, which, according to defendants, clears up any discrepancy.

The Court finds defendants' response to be totally inadequate. As plaintiffs point out, the Gay declaration perpetuates, rather than explains, the discrepancies. *See* Gay III Decl. ¶ 6. For example, the Gay declaration states that the EOUSA referred over 687 pages to Customs, yet the letter it cites as evidence of Customs' dealing with the referrals only discusses 147 pages of documents. *Id.* at ¶ 6 & Ex. A. In addition, Customs admits that it never accounted for a referral to the INS. Gay IV Decl. ¶ 7. As previously discussed, "when an agency receives a FOIA request for 'agency records' in its possession, it must take responsibility for processing the request[;][i]t cannot simply refuse to act on the ground that the documents originated elsewhere." *McGehee*, 697 F.2d at 1110. The EOUSA has failed to meet its duty to account for referred documents in this case. Defendants, therefore, are directed to submit a new *Vaughn* index for the EOUSA which accounts, in a comprehensible fashion, for the

8,737 pages referred to other agencies.[21] If the recipient agencies have lost the referred documents, it is the duty of the EOUSA, the referring agency, adequately to explain their loss.

### 2. Adequacy of the EOUSA's *Vaughn* Index

 Plaintiffs also challenge the overall adequacy of the EOUSA's *Vaughn* index. An agency's *Vaughn* index should "describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed." *King*, 830 F.2d at 217; *see also PHE*, 983 F.2d at 250. Affidavits submitted by the agency must provide enough information about withheld material so as "to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding." *King*, 830 F.2d at 218. The EOUSA's *Vaughn* index simply does not meet this standard. Its box-by-box description of documents is insufficient to allow plaintiffs or the Court to evaluate its claimed exemptions.

 The Court is mindful that in certain situations, courts have approved withholdings of entire, but discrete, categories of records which encompass similar information. *See e.g., Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 776–780, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989) (Exemption 7(C)); *Church of Scientology*, 792 F.2d at 152 (holding that a generic exemption is appropriate if the "affidavit [is] sufficiently detailed to establish that the document or group of documents in question actually falls into the ex-

---

sense, the index does not explain which of the list of reasons for the exemption applies to each particular document. For example, if Customs wishes to claim Exemption 7(C) for a particular document, it should indicate why that exemption applies to the document; it is not sufficient to cite to a list of paragraphs which assert as alternatives that the exemption was asserted because it was needed either to (1) protect the identities of Customs Officers responsible for conducting and/or supervising the investigative activities reported in the documents, or (2) protect the identities of Customs clerical personnel, or (3) pro-

tect the names and identifying data for suspects and/or the subject of Customs investigations. *See* Peterson Decl. ¶¶ 11–13; *see also King*, 830 F.2d at 221–226.

21. The Court agrees with plaintiffs that the chart in the March 8, 1996, Gay declaration, which purports to explain the referrals, is incomprehensible and unhelpful in determining whether all the 8,737 pages of documents referred have been accounted for and by whom.

empted category"); *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 789 F.2d 64, 66–67 (D.C.Cir.1986) (distinguishing between unacceptable "blanket" exemption and permissible generic determinations). The EOUSA may, therefore, be justified in withholding all "grand jury transcripts" generically pursuant to Exemption 3 without accounting for each document, since grand jury transcripts are clearly exempt under Federal Rule of Criminal Procedure 6(e). Such a generic categorization without cross-references and information about the individual documents, however, is insufficient to support an Exemption 1 withholding. *See King*, 830 F.2d at 221–225. A generic category description would also be insufficient for some documents withheld as grand jury materials, since Rule 6(e) prohibits the disclosure of grand jury materials only if they would shed light on what occurred during grand jury deliberations.[22] *See e.g., Washington Post Co. v. Department of Justice*, 863 F.2d 96, 100 (D.C.Cir.1988); *Senate of Puerto Rico*, 823 F.2d at 581–584 (court evaluating Exemption 3 claim must "require some affirmative demonstration of a nexus between disclosure and revelation of a protected aspect of the grand jury's investigation"); *Crooker v. IRS*, 1995 WL 430605 at *1–2 (D.D.C.1995). The EOUSA is directed to submit a new *Vaughn* index which describes the documents withheld in sufficient detail to permit plaintiffs and the Court to evaluate the agency's claimed exemptions.

## E. *Federal Bureau of Investigation*

Plaintiffs Albright and Henderson submitted FOIA requests to the FBIHQ and the FBIWFO, respectively, by letters dated April 1, 1985. Declaration of David R. Lieberman ¶¶ 5–6 (May 25, 1990). By letter dated May 30, 1985, the FBIHQ refused to confirm or deny the existence of records for all Albright's requests, except those pertaining to First Gulf Bank and Trust, absent the notarized authorizations of the individuals about whom Albright was inquiring. *Id.* at ¶ 5 & Ex. A–3. No notarized authorizations were ever provided to the FBIHQ. *Id.* at ¶ 5 & n. 2. By letter dated April 22, 1985, Henderson received a similar response to his request from the FBIWFO. *Id.* at ¶ 6 & Ex. B–2. Although plaintiffs appealed the FBI's decision to redact information from documents responsive to their FOIA request related to the First Gulf Bank and Trust, they did not administratively appeal the refusals to confirm or deny.

After filing this case, plaintiffs discovered that Cyrus Hashemi died in 1986 and insisted that the FBIHQ should search for and disclose records pertaining to him. In response to a supplemental memorandum filed in this case, on November 26, 1991, the FBI released 1,296 of 2,704 pages of the FBIHQ documents relating to Cyrus Hashemi, invoking Exemptions 1, 2, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E) for the remainder. *See* FBI letter of Nov. 26, 1991. The FBI also made a discretionary release of the FBIWFO documents mentioning Cyrus Hashemi.

### 1. FBI Headquarters Records Relating to Cyrus Hashemi

Plaintiffs complain that the FBI has never produced a *Vaughn* index to explain its extensive withholding of information from the FBIHQ files relating to Hashemi. The FBI claims that it had no obligation to provide an index because plaintiffs never exhausted their administrative remedies.[23]

The requirement of exhaustion of administrative remedies is an integral part of

---

**22.** For example, the EOUSA withheld items from box # 8 described as "index cards, travel vouchers, g[rand] j[ury] subpoenaed material" with the simple justification that "if released [they] would show [the] scope and inner workings of the g[rand] j[ury]." *See* Declaration of Bonnie L. Gay Ex. B (Nov. 4, 1994). The D.C. Circuit in *Senate of Puerto Rico* rejected a similar attempt by the government to justify categorically withholding grand jury exhibits with the justification that it was necessary to "protect the secrecy of the Grand Jury process." *See Senate of Puerto Rico*, 823 F.2d at 584–85.

**23.** Although defendants could conceivably have raised an exhaustion defense in reference to other parts of the FOIA request which were not administratively appealed by plaintiffs, defendants, in their supplemental memoranda, chose to raise the defense only with respect to the FBIHQ records relating to Cyrus Hashemi.

the FOIA statutory scheme. As the Court of Appeals explained:

> Exhaustion of administrative remedies is generally required before filing suit in federal court so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision. The exhaustion requirement also allows the top managers of an agency to correct mistakes made at lower levels and thereby obviates unnecessary judicial review.

*Oglesby*, 920 F.2d at 61. The possibility that administrative review may obviate the need for judicial review is particularly important in FOIA cases, because FOIA cases require district judges to take time out of their busy schedules to "acquire access to reams of paper, make intensive review of that material, and reach document-specific conclusions." *Summers v. Department of Justice*, 140 F.3d 1077, 1080 (D.C.Cir.1998). Moreover, although the Federal Rules of Civil Procedure provide that "findings of fact and conclusions of law are unnecessary on decisions of motions under Rule ... 56," Fed.R.Civ.P. 52(a), the Court of Appeals recently held that " '[d]istrict [c]ourt decisions in FOIA cases must provide statements of law that are both accurate and sufficiently detailed to establish that the careful *de novo* review prescribed by Congress has in fact taken place.' " *Summers*, 140 F.3d at 1081 (quoting *Founding Church of Scientology of Washington, D.C., Inc. v. Bell*, 603 F.2d 945, 950 (D.C.Cir. 1979)). This means that district judges must take even more time away from their otherwise crowded dockets to write lengthy and detailed opinions (such as this one) in FOIA cases. It is against this background that the Court evaluates the FBIHQ's exhaustion defense.

Plaintiffs first contend that they met the administrative exhaustion requirements of the FOIA because they "constructively exhausted" their administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C). That sec-

tion provides that if an agency does not make a determination as to whether it will comply with a FOIA request and notify the party making the request within ten [24] working days, the party making the request under the FOIA shall be deemed to have exhausted his administrative remedies. 5 U.S.C. § 552(a)(6)(A)(i) & (C) (1996). However, "if the agency responds to a FOIA request before the requester files suit, the ten-day constructive exhaustion provision in 5 U.S.C. § 552(a)(6)(C) no longer applies; actual exhaustion of administrative remedies is required." *Oglesby*, 920 F.2d at 61. The agency response must include the agency's determination of whether to comply with the request, the reasons for its decision, and notice of the right of the requester to appeal to the head of the agency. *Id.* at 65.

██ It is undisputed that although the FBIHQ did not meet the then-existing ten-day requirement of § 552(a)(6)(A)(i), it did respond to Albright's FOIA request in an appropriate manner before plaintiffs filed this case. Accordingly, plaintiffs' claims against the FBIHQ must be dismissed for failure to exhaust administrative remedies. Plaintiffs argue that they are not bound by *Oglesby* because their FOIA request was filed in 1985, *Oglesby* was not decided until 1990, and the Court of Appeals intended it to apply prospectively only.[25] Thus, plaintiffs conclude that the Court should excuse them from the requirement of exhaustion of administrative remedies.

This is not the result contemplated by *Oglesby*. The Court of Appeals in *Oglesby* recognized that individuals such as plaintiffs "should [not] be penalized for not having discerned that an administrative appeal was mandatory." *Oglesby*, 920 F.2d at 65. The appropriate remedy, however, is not to excuse plaintiffs from the administrative exhaustion requirements, but rather to "allow [plaintiff] to pursue his appeals before the administrative agencies regardless of the ex-

---

**24.** The time limit has recently been changed to twenty days. 5 U.S.C. § 552(a)(6)(A) (1996 & Supp.1998).

**25.** Prior to *Oglesby*, several district courts had interpreted § 552(a)(6)(C) as making all claims

against an agency immediately and irrevocably ripe for judicial review if the agency failed to respond to a FOIA request within the ten-day deadline. *See Oglesby*, 920 F.2d at 62 & n. 4 (citing cases).

piration of the agencies' appeal deadlines." *Id.* at 65; *Grove v. CIA,* 752 F.Supp. 28, 31 (D.D.C.1990).

 Alternatively, plaintiffs contend that the FBIHQ has waived any exhaustion defense it may Dave had because it did not raise the exhaustion defense in its initial motion for summary judgment or, alternatively, because the FBIHQ released 1,296 pages of documents on November 21, 1991, in response to Albright's original FOIA request. The Court disagrees with plaintiffs that either of these incidents amounts to a waiver of the FBIHQ's exhaustion defense. Defendants listed failure to exhaust administrative remedies as an affirmative defense in their June 7, 1987, answer. *See* Ans. p. 1. The Court is aware of no authority which requires a party to raise an affirmative defense pled in its answer in its first motion for summary judgment in order to avoid waiving that defense. *See Daingerfield Island Protective Soc'y v. Babbitt,* 40 F.3d 442, 444–45 (D.C.Cir.1994) (holding that the government had not waived an affirmative defense raised in its answer even though it was not raised in a subsequent summary judgment motion); *Kulzer v. Pittsburgh–Corning Corp.,* 942 F.2d 122, 125 (2d Cir.1991), *cert. denied,* 503 U.S. 939, 112 S.Ct. 1482, 117 L.Ed.2d 624 (1992). Plaintiffs also fail to explain how the FBIHQ's decision to release some documents related to Cyrus Hashemi waived its exhaustion defense. Agencies are generally free to make discretionary disclosures of information under the FOIA unless they are otherwise prohibited by law from so doing.[26] *See Crumpton v. Stone,* 59 F.3d 1400, 1404 (D.C.Cir.1995), *cert. denied,* 516 U.S. 1147, 116 S.Ct. 1018, 134 L.Ed.2d 98 (1996); *Mead Data,* 566 F.2d at 258. Penalizing agencies by holding that they waive their exhaustion defense if they make a discretionary document release after the time for an adminis-

trative appeal had expired would not advance the underlying purpose of the FOIA—the broadest possible responsible disclosure of government documents. *See Chrysler Corporation v. Brown,* 441 U.S. 281, 290–94, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *Mobil Oil Corp. v. EPA,* 879 F.2d 698, 701–02 (9th Cir.1989).

Accordingly, the Court concludes that plaintiffs' objections to FBIHQ's treatment of its request for records relating to Cyrus Hashemi are not appropriately before the Court at this time. In light of the fact that the relevant administrative proceedings in this case occurred well before the *Oglesby* decision, the Court allows Albright to pursue his administrative remedies regardless of the expiration of the FBI's appeal deadline. In 1985, when Albright made his FOIA request, the FBI's time limit for appealing the denial of a FOIA request was within thirty days of receipt of the agency's response, 28 C.F.R. § 16.8(a) (1985). Accordingly Albright must administratively appeal the FBI's treatment of his FOIA request to FBIHQ within thirty days of the date of this Opinion and Order.[27] Following his administrative appeals, or if the FBI does not respond within twenty days of the appeal in accordance with § 552(a)(6)(A)(ii), Albright will be deemed to have fully exhausted his administrative remedies and may revive his claims by amending the complaint to reflect this fact. *See Oglesby,* 920 F.2d at 65–66.

### 2. Adequacy of Search of the FBIWFO Files

In their most recent submission, plaintiffs state that the FBIWFO "[a]pparently ... has not searched certain items of the request, .... [t]he search must be conducted, and any records found must be *vaughned.*" Pls.' Supp.Resp. of May 8, 1998, at 13. As best as the Court is able to discern, plaintiffs

---

**26.** The Court labels the FBIHQ's November disclosure as a "discretionary" disclosure because, as previously stated, the FBI was under no obligation to make such a disclosure—plaintiffs had not administratively appealed the FBI's initial decision not to release the information, nor had they filed a new FOIA request. As far as the FBI was concerned, the matter was "closed". *See* Lieberman Decl. at p. 3 n. 2.

**27.** The Court notes that the FBI's November 26, 1991, release of information relating to Cyrus Hashemi, essentially moots any administrative appeal which Albright may have had relating to the FBI's refusal to confirm or deny the existence of Hashemi records. Accordingly, it is this November 26, 1991, release which should be the subject of Albright's administrative appeal.

object to the fact that the FBIWFO never performed a search for records in reference to Reza Hashemi, Davari, Nahidan, and Pottinger. Plaintiffs presume that such a search was never performed because the FBI refused to confirm or deny the existence of any records relating to these individuals, citing Exemptions 6 and 7(C).[28]

Although an agency must usually provide detailed affidavits proving that it performed an adequate search for documents, an exception exists if the agency properly refuses to confirm or deny the existence of records in accordance with Exemption 7(C). *See Nayed v. INS*, 1993 WL 524541 at *3 (D.D.C.1993) (citing *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C.Cir.1976)). Thus, the adequacy of the FBIWFO's search for records in reference to Reza Hashemi, Davari, Nahidan, and Pottinger depends on whether the FBI properly asserted a categorical exemption for all records falling within plaintiffs' request.

Exemption 7(C) allows an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."[29] 5 U.S.C. § 552(b)(7)(C). Under the exemption, a "Glomar" response, which neither confirms nor denies the existence of responsive records, may be issued if speaking directly even to the existence of the records would associate the individual named in the request with criminal activity. *See, e.g., Reporters Committee*, 489 U.S. at 757, 109 S.Ct. 1468; *Nation Magazine*, 71 F.3d at 893. Although in most cases a court must balance the public interest in disclosure against the personal privacy interests of the individual who is the subject of the FOIA request in an individualized fashion, "categorical decisions may be appropriate and in-

dividual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction." *Reporters Committee*, 489 U.S. at 776, 109 S.Ct. 1468.

In *Reporters Committee*, the Supreme Court concluded that "as a categorical matter . . . a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy." *Id.* at 780, 109 S.Ct. 1468; *see also Nation Magazine*, 71 F.3d at 894; *Perrone v. FBI*, 908 F.Supp. 24, 26 (D.D.C.1995). This privacy interest does not disappear just because the public already may be aware that the individual has been the subject of a law enforcement investigation. *See Reporters Committee*, 489 U.S. at 762–63, 109 S.Ct. 1468.

In this case, the FBI submitted evidence, which plaintiffs do not appear to dispute, that "[i]f files concerning the subjects of the plaintiffs' FOIA requests (Reza Hashemi, Dvari, Nahidan, and Pottinger) are to be found within the FBI's system of records, they would be comprised of records or information compiled during the course of specific FBI investigations." Lieberman Decl. ¶ 41. This conclusion is supported by the fact that plaintiffs' FOIA request sought documents linking the four named individuals to the taking of American hostages in Iran, negotiations to secure their release, the assassination of Ali Akbar Tabatabai, and "actual or potential violations of law regarding the export of weapons and military spare parts to Iran." Moreover, plaintiffs limited their FOIA request only to documents containing the individuals' names and these particular activities, rather than requesting all records in the FBI's possession naming those individuals, negating any contention by plaintiffs that raising a categorical exemption in re-

---

**28.** The FBIWFO refused to confirm or deny the existence of any records concerning Cyrus Hashemi, Reza Hashemi, Davari, Nahidan, and Pottinger absent their notarized authorizations. *See* Lieberman Decl. ¶ 7(b). The FBIWFO did, however, search for documents concerning First Gulf Bank and Trust Limited, *see id.*, and after Cyrus Hashemi's death, the FBIWFO conducted a search for records pertaining to him. *See* Declaration of Michael D. Turner ¶ 9 (Apr. 27, 1993).

Plaintiffs have pointed to no evidence to question the adequacy of either of these latter two searches. *See id.*

**29.** Because Exemption 7(C) covers this case, there is no need to address the applicability of Exemption 6. *See Reporters Committee*, 489 U.S. at 762 n. 12, 109 S.Ct. 1468.

sponse to their request would impermissibly shield information in FBI files that does not link the individuals to potential criminal activity. *Compare Nation Magazine,* 71 F.3d at 895–96 (rejecting a categorical exemption when it was likely that some information in the relevant files would not have implicated the third-party in criminal activity).

Plaintiffs, however, contend that a categorical exemption is not appropriate in this case because of the public interest in disclosure of the FBI files relating to Iran–Contra and the "October Surprise." As evidence of the public interest, plaintiffs note that: (1) in 1984 the Department of Justice prepared press releases and held press conferences discussing these matters, (2) those charged in the matter were "prominent members of the Iranian community and a former Assistant Attorney General of the United States Department of Justice," and (3) there was heavy media coverage of the alleged conspiracy. *See* Declaration of Edward Spannus ¶¶ 16–17 & Exhibits (December 19, 1991).

The Court disagrees that the public interest cited by plaintiffs is sufficient to undermine the propriety of the FBI's categorical refusal to confirm or deny the requested records in this case. Whether the media and other members of the public may be interested in the information is not the relevant inquiry. "[T]he public interest to be taken into the balance is that in '[o]fficial information that sheds light on an agency's performance of its statutory duties.'" *Quinon v. FBI,* 86 F.3d 1222, 1231 (D.C.Cir.1996) (quoting *Reporters Committee,* 489 U.S. at 773, 109 S.Ct. 1468); *see also SafeCard Servs., Inc. v. SEC,* 926 F.2d 1197, 1206 (D.C.Cir. 1991) (holding that categorical exemption of information relating to private individuals in investigatory files is proper unless the documents are "necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity"). Moreover, "[w]hen governmental misconduct is alleged as the justification for disclosure, the public interest is insubstantial unless the requester puts forward compelling evidence that the agency denying the FOIA request is engaged in illegal activity." *Quinon,* 86 F.3d at 1231. Although plaintiffs, in their most recent pleading, attempt to argue that they need the information in the FBI records as a "direct record of what the Government [wa]s up to" during its investigation of the alleged arms-for-hostages conspiracy, the Court rejects this post-hoc rationalization of the public interest because plaintiffs have not even suggested that there may have been FBI wrongdoing during the investigation.[30] *See id.*

### 3. Adequacy of *Vaughn* Indices

#### a. FBI Headquarters

Plaintiffs first object to the fact that the FBI has never produced a *Vaughn* index for FBIHQ records pertaining to Cyrus Hashemi. As previously discussed, claims relating to these documents are dismissed until plaintiffs have exhausted their administrative remedies. The Court will only evaluate the adequacy of the FBI's treatment of the FBIHQ documents mentioning Cyrus Hashemi in the event the administrative process proves ineffective to resolve the differences between the parties.

#### b. Documents Referred to Other Agencies

Plaintiffs next object to the FBI's treatment of documents referred to it by the EOUSA which were subsequently referred to other agencies. The first declaration of John M. Kelso, Jr., with attached exhibits, filed December 19, 1994 [hereinafter "Kelso I

---

30. Plaintiffs rely heavily on the Court of Appeals' recent decision in *Summers* as support for their contention that FBI files mentioning these individuals are of public interest. In that case, the plaintiff sought to compel the release of the official and confidential records of former FBI Director J. Edgar Hoover, and his request was "designed to disclose misconduct at the highest levels of the FBI." *Summers,* 140 F.3d at 1083. The Court of Appeals noted that in *Summers,* "[a]ll concerned generally agree[d] that Hoover maintained the files for his own purposes which many ... allege to have included improper ones ... [such as] exercising power in the political arena." *Id.* at 1081–82. This is clearly distinguishable from the situation in this case because plaintiffs have not offered any credible evidence that the investigative files related to the Iran hostage situation and the "October Surprise" would shed any light on FBI wrongdoing in conducting those investigations.

Decl."], comprises the *Vaughn* index for these documents. On page 4 of the declaration, Kelso explains:

> Material was located in these referred documents which originated with other government agencies. Consultation is being effected for these pages, and upon completion, all releasable portions will be forwarded directly to the plaintiffs. In addition, we have located the documents of other Government agencies in the referred material. These agencies have been requested to process and correspond directly with the plaintiffs regarding their documents.

*Id.* n. 4. Plaintiffs complain that they "have not been provided with a *Vaughn* index or any inventory or accounting of these referrals" so they have "no way of knowing what materials remain unaccounted for." *See* Pls.' Supp. Response of May 8, 1998, at 10.

Upon consideration of the first Kelso declaration and related exhibits, the Court concludes that the FBI has adequately explained which documents it referred out of the documents it received from the EOUSA. Although footnote 4 does not explain which documents were referred for "consultation" and which were "directly" referred, the attached exhibits do. Exhibit A, Part VII, clarifies that page 2 of document 7–4 was referred to the Department of State for consultation, and that plaintiffs would "be advised by the FBI as to the releasability of this information following our consultation with [the Department of State]." The documents *referred for direct* response are identified as documents 3–69 and 3–70. *See* Kelso I Decl., Ex. A–III.

The Court is, however, unable to determine whether the FBI has met its burden of ensuring that redactions from documents referred to other agencies are properly documented in a *Vaughn* index. *See Williams,* 1993 WL 157679 at *1. The FBI claims that plaintiffs received responses as to Document 3–69 from the Criminal Division of the Department of Justice on November 3, 1994, and as to Document 7–4 from the State Department on August 11 or September 10, 1993. *See* Defs.' Reply to Pls.' Resp. to Defs.' Supp.Memo. at 17 (July 21, 1997). Plaintiffs claim that they did not receive anything from either agency on the dates identified which they can link to the documents referred from the FBI.[31] In order to discharge their burden under the FOIA, the FBI must ensure that plaintiffs received adequate responses concerning the three referred documents, accounting for any redactions.

### 4. Exemption 1 Claims for FBIWFO Documents

Plaintiffs next object to the FBI's reliance on Exemption 1 for various redactions from the FBIWFO documents. As previously discussed, because Exemption 1 deals with national security issues, the Court gives substantial weight to detailed agency explanations. *Krikorian,* 984 F.2d at 464; *Miller,* 730 F.2d at 776. In order to be entitled to deference, however, agency affidavits must "describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed." *King,* 830 F.2d at 217 (internal citations omitted).

■■■ The FBI's affidavits discussing Exemption 1 are not sufficiently detailed to allow the Court to engage in an evaluation of its Exemption 1 claims. The declarations of Richard D. Davidson and Sherry L. Davis utilize a coded format, whereby the Court is provided redacted versions of the relevant documents which indicate on the face of the document the "code" which corresponds to a justification for the particular redaction in an accompanying code-catalogue. This method of *Vaughn* indexing is not in itself improper. However, the Court of Appeals has made it clear that when such a method is utilized, the agency must ensure that the justifications corresponding to the codes used are as spe-

---

**31.** Defendants cite the third Gay declaration as evidence that plaintiffs have received responses to Documents 3–69 and 7–4. As previously discussed, however, the "chart" in the third declaration is confusing and therefore does not discharge the FBI's duty to account for the documents and any redactions therefrom.

cific as possible. *See id.* at 221–23. Although the affidavits list multiple justifications for redacting information, there are only five codes used to justify specific redactions. *See* Davis Decl. ¶¶ 7–10 and pp. 21–23. Thus, as in *King*, the declarations "make [it] clear that the FBI could provide subcategory descriptions of redacted material in far more detail than it has." *King*, 830 F.2d at 221–222. Moreover, the "account of consequences likely to follow disclosure of the information in question is similarly deficient, presenting myriad damage possibilities for each category of classifiable information."[32] *Id.* at 222. Accordingly, the FBIWFO is directed to submit a new affidavit with more specific code categories and explanations for the Exemption 1 redactions. The Court reserves judgment on the propriety of the FBI-WFO's Exemption 1 redactions until it receives the new affidavit and plaintiffs have had an opportunity to refine their objections.[33]

### 5. Exemption 3 Claims for FBIWFO Tapes

Plaintiffs object to the FBI's decision to withhold the transcripts of several taped conversations based on Exemption 3 and Federal Rule of Criminal Procedure 6(e). These taped conversations were obtained by the FBI during the course of the investigation of Cyrus Hashemi, and were subsequently subpoenaed by a grand jury. *See* Kelso I Decl. ¶ 23. Plaintiffs claim that the FBI has not sustained its burden to show that the transcripts fall within the purview of Rule 6(e).

██ Section 552(b)(3) provides an exemption for matters which are:

specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no

discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld. . . .

It is well-established that Federal Rule of Criminal Procedure 6(e) satisfies the requirements of § 552(b)(3). *See Senate of Puerto Rico*, 823 F.2d at 582 n. 23; *Fund for Constitutional Gov't v. National Archives & Records Serv.*, 656 F.2d 856, 867–68 (D.C.Cir. 1951). Thus, Exemption 3 may be invoked to shield documents which may shed light on "matters occurring before [a] grand jury." *See* Fed.R.Crim.P. 6(e)(2).

The Court of Appeals has consistently held that "Rule 6(e) does not draw a 'veil of secrecy' over all documents about activity investigated by the grand jury or even all documents revealed to the grand jury." *Washington Post*, 863 F.2d at 100 (quoting *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C.Cir.), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)); *Senate of Puerto Rico*, 823 F.2d at 582. Racher, "[t]he relevant inquiry is whether the document would reveal the inner workings of the grand jury, such as witness names, or the substance of testimony or the direction and strategy of the investigation." *Washington Post*, 863 F.2d at 100. Thus, the Court of Appeals has rejected Exemption 3 redactions based solely on the justification that the documents requested were exhibits presented to the grand jury. *See id.; Senate of Puerto Rico*, 823 F.2d at 583–84.

██ In this case, however, the FBI has sufficiently provided an "affirmative demonstration of a nexus between disclosure and revelation of a protected aspect of the grand jury's investigation." *Senate of Puerto Rico*, 823 F.2d at 584. The first Kelso declaration explains that releasing transcripts of the conversations recorded during the FBI's investigation of Cyrus Hashemi which were played

---

**32.** In fact, the language used to describe the logical nexus between disclosure of intelligence source information and damage to the national security for code "(D)(I)" in the Davis declaration is, with a few minor changes and the addition of a discussion of the importance of keeping dead sources confidential, almost exactly the same language used in the declaration at issue in *King*, which the Court of Appeals specifically

identified as being too "categorical." *Compare* Davis Decl. pp. 21–23 *with King*, 830 F.2d at 223 n. 96.

**33.** Once again, the Court emphasizes that it is not requiring the FBI to reclassify any of the documents. The agency is simply requested to provide a more detailed affidavit.

**28**

to the grand jury would tend to show "the direction or path the Grand Jury was taking." Kelso Decl. ¶ 23. The Court cannot question the FBI's conclusion that releasing conversations taped during an FBI investigation of a particular individual and subsequently presented to a grand jury would tend to show the "substance of testimony or the direction and strategy of the investigation."[34] See Washington Post, 863 F.2d at 100. Thus, the FBI is entitled to summary judgment on its Exemption 3 claims for the FBIWFO transcripts.

### 6. Specific Exemption 7(C) Claims for FBIWFO Documents Relating to Cyrus Hashemi

Plaintiffs raise several objections to the FBI's redaction of information pursuant to Exemption 7(C) from documents relating to Cyrus Hashemi that the FBIWFO released. First, plaintiffs contend that the FBI has admitted to using an improper balancing test in evaluating its Exemption 7(C) decisions, in that it " 'accorded great weight to the privacy interests of the individuals named in the records and little, if any weight to the public interests.' " See Pls.' Supp.Resp. of May 8, 1998, at 30 (emphasis omitted) (quoting Defs.' Reply to Pls.' Opp. to Motion for S.J., at 19–20 (Apr. 7, 1992)). The Court notes, however, that the statement cited by plaintiffs discussed the FBI's decision categorically to refuse to confirm or deny the existence of any FBIWFO records relating to the named individuals in plaintiffs' FOIA requests, not to the individual Exemption 7(C) decisions made during the processing of the FBIWFO documents relating to Cyrus Hashemi.[35] Rather, the first Kelso declaration demonstrates that the FBI carefully weighed the privacy interests of the individuals identified in the FBIWFO documents released to plaintiffs; it divides the Exemption 7(C) redactions into eight subcategories and explains the considerations that went into each cate-

gory of redaction. See Kelso I Decl. ¶¶ 24–37. Absent more specific evidence that the FBI did not give proper weight to the public interest in evaluating its Exemption 7(C) redactions, the Court will not order the FBI to re-evaluate those redactions.

■ Plaintiffs next contend that the FBI did not properly invoke Exemption 7(C) because it did not meet its "obligation to determine whether persons whose privacy it invokes [we]re dead or alive." See Pls.' Supp. Resp. of May 8, 1998, at 32. As far as the Court can discern, this is the first time plaintiffs have raised this argument. The contention is clearly motivated by remarks in concurrences filed by Judges Silberman and Williams in the Court of Appeals' recent Summers decision. Even assuming arguendo that such an obligation exists, and that plaintiffs have not waived their argument by raising it at such a late stage of this litigation, any obligation to determine whether an individual is alive or dead would be limited to the cases where the agency "has, or has ready access to, data bases that could resolve the issue." Summers, 140 F.3d at 1085 (Williams, J, concurring). Plaintiffs have not proffered any evidence that the FBI had ready access to data indicating whether individuals mentioned in the FBIWFO records are alive or dead. The Court thus rejects plaintiffs' belated attempt to attack the FBI's Exemption 7(C) redactions on that ground.

■ Plaintiffs' final general objection to the FBI's Exemption 7(C) redactions is that the FBI improperly refused to re-evaluate their Exemption 7(C) redactions in light of six privacy waivers submitted by plaintiffs in 1992. Plaintiffs offer no legal support for their request, other than the observation that the FBI would have to recognize the privacy waivers if they were tendered as part of a new request. The fact that plaintiffs may file a new FOIA request today, thereby forcing the agencies to re-review the documents, taking into account the privacy waivers, is

---

**34.** The transcripts of the tapes recorded during the FBI investigation are distinguishable from the documents at issue in Dresser and Washington Post, which were created for independent corporate purposes unrelated to the grand jury's investigation. See Washington Post, 863 F.2d at 100; Dresser, 628 F.2d at 1382–83.

**35.** The propriety of the FBIWFO's categorical refusal to confirm or deny the existence of documents relating to the other named individuals in the FOIA request has been discussed above.

not legally significant. If plaintiffs follow that route, they "will stand in line behind other FOIA requesters; ... [u]nless the [agencies] unlawfully withheld information in [their] prior responses, a court has no warrant to place [plaintiffs] at the head of the current [agency] FOIA queue." *Bonner*, 928 F.2d at 1153. To hold otherwise would "create an endless cycle of judicially mandated reprocessing" of FOIA claims every time a FOIA requester supplemented his initial request. *See id.* at 1152.

The only specific instances of allegedly improper Exemption 7(C) redactions cited by plaintiffs are the redactions from the audiotapes and written transcripts of the Cyrus Hashemi conversations recorded by the FBI. Plaintiffs point out that, although most transcripts are released with Cyrus Hashemi's side of the conversation disclosed and the other side withheld, in a few instances the other party's identity is disclosed. Plaintiffs apparently wish the Court to conclude that this provides evidence of bad faith by the FBI in redacting information pursuant to Exemption 7(C). On the contrary, the Court concludes that this "discrepancy," absent any other evidence of bad faith, indicates that the FBI took time to evaluate the propriety of each ·Exemption 7(C) withholding, rather than automatically redacting the identity of any person who had a conversation with Cyrus Hashemi on the tapes.[36]

Finally, plaintiffs take issue with the FBI's Exemption 7(C) balancing test. Exemption 7(C) allows an agency ·to redact portions of documents compiled for law enforcement purposes if "the privacy interest at stake outweighs the public's interest in disclosure." *Quinon*, 86 F.3d at 1230. Each time information from the transcripts or. tapes was withheld, the FBI "determined that individual privacy interests were not outweighed by any public. interest because that same information was void of data regarding FBI activities and operations."[37] Declaration of John M. Kelso, Jr. ¶ 22 (May 22, 1995) [hereinafter "Kelso II Decl."].

▮ Based on the Kelso declarations and the entire record, the Court concludes that the privacy interests of the individuals mentioned on the surveillance tapes and in the transcripts clearly outweigh any public interest in disclosure. Plaintiffs argue that the content of the conversations is of great public interest because it "sheds light on what information the FBI obtained as a result of its investigation ... [and] the thoughts and actions of persons who ... were engaged in activities related to the U.S. hostages being held in Iran .... [and] has the potential to shed light on the operations of one or more government agencies other than the FBI." Pls.' Supp.Resp. of May 8, 1998, at 35. As the Court has already explained, however,

---

36. Plaintiffs also attempt to·make an issue out of the fact that .the FBI has acknowledged that although the surveillance was designed to produce information implicating Cyrus Hashemi in the murder of All Akbar Tatabai and terrorist activities, it did not turn up any evidence of such activities. Plaintiffs contend that this fact means that "Kelso's suggestion that any individual overheard on the tapes is automatically linked to international terrorism is not sustainable." Pls.' Supp.Resp. of May 8, 1998, at 37. The Court cannot discern this "suggestion" in the second Kelso declaration. Rather, Kelso testifies that "[d]isclosure of the persons who were recorded, mentioned, or otherwise identified in these tapes has the potential to associate those persons with terrorism or other criminal conduct." Declaration of John M. Kelso, Jr. ¶ 22 (May 22, 1995) [hereinafter "Kelso II Decl."]. Plaintiffs acknowledge that the electronic surveillance produced evidence that Hashemi was involved in· other criminal activity related to the hostage crisis and illegal military shipments to Iran. *See* Pls.' Supp. Resp. of May 8, 1998, at 36–37.

37. The FBI redacted identifying information pertaining to third parties who are of investigative interest to the FBI because to release that information "would announce to the world that they were of investigative interest to the FBI and therefore, permit derogatory inferences to be made therefrom .... [and] likely subject them to embarrassment, humiliation, or unwarranted public attention." Kelso II Decl. ¶ 27; *see also* Kelso ·Decl. ¶ 36. Moreover, the FBI redacted identifying information of individuals merely mentioned in the recordings because "being linked with any law enforcement investigation carries with it a negative connotation ... [and] could subject [the individuals] to harassment, embarrassment, or ... result in undue public attention." Kelso II Decl. ¶ 29; *see also* Kelso Decl. ¶ 34 (transcripts). Moreover, some of the individuals on the tapes were discussing "highly intimate personal matters," which could cause extreme embarrassment. Kelso II Decl. ¶ 33.

"the public interest to be taken into the balance is that in '[o]fficial information that sheds light on an agency's performance of its statutory duties,'" not public interest in the subject matter of an FBI investigation. *See Quinon*, 86 F.3d at 1231 (quoting *Reporters Committee*, 489 U.S. at 773, 109 S.Ct. 1468). Although plaintiffs speculate that "there is some reason to believe that [Hashemi and Pottinger] were acting on behalf of agencies in the U.S. government, particularly the State Department and CIA," *see* Pls.' Supp. Resp. of May 8, 1998, at 35, "[w]hen governmental misconduct is alleged as the justification for disclosure, the public interest is insubstantial unless the requester puts forward compelling evidence that the agency denying the FOIA request is engaged in illegal activity." *See Quinon*, 86 F.3d at 1231. Moreover, the fact that the individuals may have already been publicly disclosed as targets of the FBI's investigation does not diminish their privacy interests in having the tapes of their conversations with Cyrus Hashemi withheld. *See Reporters Committee*, 489 U.S. at 762–63, 109 S.Ct. 1468.

## F. *State Department—Adequacy of Search*

The sole issue remaining between plaintiffs and the State Department is whether the State Department conducted an adequate search of its records. Plaintiffs argue that the search was inadequate because the State Department did not search some of its files and plaintiffs believe that more documents logically must exist. Defendants argue that the State Department is entitled to summary judgment on this issue because it proffered substantial evidence that it conducted a search reasonably likely to produce all documents responsive to plaintiffs' FOIA request.

As previously discussed, an agency's duty in a FOIA case is simply to "show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68. Affidavits are sufficiently detailed when they set forth the search terms and the type of search performed, and aver that all files likely to contain material were searched. *See id.*

The State Department has met its burden to describe the adequacy of its search. The declaration of Frank M. Machak describes in detail the search methodology, the different types of files at the State Department, which files were searched, and why. Machak Decl. ¶¶ 4–13, 15–17. Plaintiffs contend that the search was not adequate because the State Department did not search the department and post working files and retired "lot files." It is clear from the State Department's submission, however, that those files were not searched because "based upon the focus on individuals and the time frame of the request, and the manner in which State Department files are maintained, it was not likely that records responsive to the request would be contained in any other Department record system or that any other record system reasonably could be searched in response to this request."[38] *Id.* at ¶ 17.

Because the State Department demonstrated the adequacy of its search, plaintiffs can avoid summary judgment only if they show that the search was not made in good faith. *Goland*, 607 F.2d at 352; *Miller*, 779 F.2d at 1384. Plaintiffs proffer evidence that there were frequent contacts and discussions between Hashemi and State Department officials and conclude, based on this information, that there must be more documents which

---

**38.** The State Department searched those files which officials expected would contain the information requested by plaintiffs: the files of the Diplomatic Security Service; the Office of the Executive Secretariat; and the Central Files. Machak Decl. ¶ 10. The State Department explained that it was not reasonable or feasible to search the department and post working files and the "lot" files because those were organized according to general subject matter and geographical locations, not names (the focus of plaintiffs' FOIA request). *Id.* The State Department's description of the files also makes it clear that they were not likely to contain relevant information. The department and post working files consist "generally of duplicate, working copies of documents already contained in the Central Files or decentralized records systems ... [and] specialized documents prepared by or furnished to the office or foreign service post in connection with the performance of its official duties." *Id.* at ¶ 9. The lot files consist of retired working files. *Id.*

the State Department's search did not discover. However a requester's "[m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search" for them. *Steinberg,* 23 F.3d at 552 (internal quotation omitted); *see also Oglesby,* · 920 F.2d at 67 n. 13. Plaintiffs have failed to raise evidence of bad faith sufficient to rebut the State Department's description of the adequacy of its search, and thus the State Department is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in part and grants plaintiffs' motion for partial summary judgment and motion to compel further searches and *Vaughn* indices in part.